EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| Héctor Luis Delucca Jiménez<br><br>Apelado<br><br>v.<br><br>Colegio de Médicos Cirujanos de Puerto Rico y otros<br><br>Apelantes | 2023 TSPR 119<br><br>213 DPR ___ |

Número del Caso: AC-2022-0083

Fecha: 2 de octubre de 2023

Tribunal de Apelaciones:

    Panel Especial

Abogado de la parte apelante:

    Lcda. Tania Maité Colón Rodríguez
    Lcdo. Carlos Juan Cardona Rosado

Abogados de la parte apelada:

    Lcdo. Iván A. Rivera Reyes
    Lcdo. Ramón L. Rosario Cortés
    Lcdo. Miguel A. Rodríguez Ramos

Oficina del Procurador General:

    Hon. Fernando Figueroa Santiago
    Procurador General

    Lcdo. Omar Andino Figueroa
    Subprocurador General

Abogados de los *Amicii Curiae:*

    *Asociación de Abogados de Puerto Rico:*
    Lcdo. Ferdinand Ocasio

    *Asociación Médica de Puerto Rico:*
    Lcdo. Federico Hernández Denton
    Lcdo. Luis R. Román Negrón


Materia: Derecho Constitucional – Inconstitucionalidad de la colegiación compulsoria para poder ejercer la medicina en Puerto Rico.

Este documento está sujeto a los cambios y correcciones del proceso de compilación y publicación oficial de las decisiones del Tribunal Supremo. Su distribución electrónica se hace como un servicio público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Héctor Luis Delucca Jiménez

     Apelado

      v.

                              AC-2022-0083

Colegio de Médicos Cirujanos
de Puerto Rico y otros

     Apelantes

Opinión del Tribunal emitida por el Juez Asociado señor MARTÍNEZ TORRES

En San Juan, Puerto Rico, a 2 de octubre de 2023.

El requisito estatutario de colegiación compulsoria para poder ejercer legítimamente la medicina en Puerto Rico es inconstitucional. En la controversia ante nuestra consideración, indiscutiblemente, el Estado tiene un interés apremiante en regular el ejercicio de la medicina para resguardar la salud pública; sin embargo, la colegiación obligatoria no es necesaria para lograr este objetivo. Por esa razón, la medida impugnada no sobrevive el escrutinio estricto.

De un análisis sosegado del esquema instituido por la Asamblea Legislativa para regular la práctica de la medicina, surge con meridiana claridad que la

Junta de Licenciamiento y Disciplina Médica es el único organismo rector de la profesión médica en Puerto Rico. Es mediante el buen ejercicio de esas funciones delegadas a la Junta que el Estado afianza su interés apremiante. Ante ese escenario, el requisito de membresía obligatoria impuesto a la clase médica constituye un menoscabo del derecho fundamental de los galenos a asociarse con quien deseen.

I

La controversia ante nuestra consideración se originó mediante la presentación de una demanda de sentencia declaratoria por parte del Dr. Héctor Luis Delucca Jiménez contra el Colegio de Médicos Cirujanos de Puerto Rico y el Estado Libre Asociado de Puerto Rico. El doctor Delucca Jiménez solicitó que se declarara la inconstitucionalidad de la colegiación compulsoria de los médicos cirujanos. Explicó que a pesar de que cumplía con todos los requisitos para ejercer la medicina en Puerto Rico no deseaba ser miembro del Colegio de Médicos. Arguyó que el requisito de colegiación compulsoria lesionaba su derecho constitucional a la libertad de asociación y expresión.

Posteriormente, el doctor Delucca Jiménez presentó una moción de sentencia sumaria, en la que expuso que procedía un decreto de inconstitucionalidad por la vía sumaria, porque la controversia planteada en el caso era estrictamente de derecho.

En respuesta, el Estado también presentó una solicitud de sentencia sumaria. En síntesis, planteó que la colegiación obligatoria superaba el escrutinio estricto, pues el derecho de los médicos a la libertad de asociación cedía ante el interés estatal apremiante de promover y velar por la salud del pueblo. Resaltó que en este caso la profesión bajo análisis ejerce un rol vital para proteger la salud de las personas. A su vez, destacó que el Colegio desempeña un rol social importante en protección de la salud y el bienestar público.

Por su parte, el Colegio se unió a la moción de sentencia sumaria del Estado y esbozó que la solicitud del doctor Delucca Jiménez era improcedente, ya que el requisito de afiliación obligatoria superaba el rigor constitucional. En apoyo, enfatizó que la Asamblea Legislativa le delegó una serie de facultades y obligaciones ajenas a la regulación de la profesión que están directamente dirigidas a promover el interés apremiante de salvaguardar la salud pública. Añadió que la Asamblea Legislativa le autorizó a crear una entidad sin fines de lucro para instaurar programas de servicio a la comunidad. En esa línea, destacó que la Fundación del Colegio de Médicos Cirujanos de Puerto Rico ha ocupado un rol protagónico en la protección del bienestar general durante situaciones de emergencia como el paso del Huracán María, el terremoto acaecido en el área sur de Puerto Rico en 2020 y la pandemia del Covid-19.

Además, el Colegio explicó que creó el Instituto de Investigación Clínica y Desarrollo Tecnológico para implementar programas educativos y promover estudios científicos en aras de contribuir a la salud pública.

Sucesivamente, el doctor Delucca Jiménez presentó una réplica en la que, en esencia, argumentó que el Estado y el Colegio no lograron superar el crisol constitucional. Explicó que los demandados (aquí peticionarios) no identificaron un interés apremiante que justificara la colegiación compulsoria y tampoco expusieron que ese fuera el medio menos restrictivo para lograr los objetivos del Estado. Dicho de otro modo, adujo que los demandados no probaron —ni siquiera explicaron— la inexistencia de medios alternos a la colegiación compulsoria. De igual forma, el doctor Delucca Jiménez esbozó que todas las aportaciones del Colegio de Médicos podían realizarse sin obligar a estos profesionales de la salud a afiliarse a la mencionada entidad. Finalmente, reiteró que existían medios menos lesivos de su derecho de asociación, como por ejemplo la regulación de la profesión a través de la Junta de Licenciamiento y Disciplina Médica.

Tras examinar las posturas de las partes, el Tribunal de Primera Instancia, mediante sentencia sumaria, concluyó que la colegiación compulsoria de los médicos era constitucional. Para llegar a esa conclusión, el foro primario determinó que el Colegio de Médicos forma parte

esencial del esquema que le permite al Estado adelantar su interés apremiante de promover el bienestar y la salud pública. A su vez, acogió el planteamiento del Colegio respecto a que no es un mero espejo de la Junta, dado que se le delegaron múltiples funciones independientes de carácter público. Finalmente, coligió que el pago de una cuota obligatoria para el financiamiento de la función pública del Colegio, como requisito para practicar la profesión, era una lesión mínima del derecho de asociación.

Luego de presentar una reconsideración que fue denegada, el doctor Delucca Jiménez presentó una apelación ante el foro intermedio. En suma, arguyó que erró el Tribunal de Primera Instancia al validar la colegiación compulsoria a pesar de que el Estado jamás demostró que no existían medidas menos onerosas para alcanzar su interés apremiante.

Por su parte, el Colegio de Médicos reiteró su postura respecto a que la colegiación compulsoria respondía no solo al interés del Estado de regular la profesión, sino al de proteger la salud pública. En ese contexto, expresó que como las funciones de índole pública o social delegadas al Colegio no estaban dentro de aquellas delegadas a la Junta, esta última no podía constituir el medio menos intrusivo para salvaguardar el interés público.

Posteriormente, en su alegato, el Estado recalcó que se debía sostener el mandato de colegiación por el importante

rol público que le fue delegado al Colegio en pro de la salud puertorriqueña.

Sometido el asunto ante su consideración, el Tribunal de Apelaciones emitió una sentencia en la que revocó al Tribunal de Primera Instancia y decretó la inconstitucionalidad de la colegiación compulsoria de la clase médica. El foro intermedio ultimó que, si bien el Estado tiene un interés apremiante en reglamentar la práctica de la medicina y resguardar la salud pública, en este caso no se demostró la inexistencia de medidas menos restrictivas para lograrlo. Asimismo, el foro *a quo* expuso que la Junta de Licenciamiento y Disciplina médica es un medio menos intrusivo para lograr el interés gubernamental. Por último, resaltó que todos los deberes y responsabilidades que se le otorgaron al Colegio pueden lograrse sin tener que imponer una colegiación compulsoria.

Inconforme, el Colegio de Médicos recurrió ante nos. En síntesis, reitera su planteamiento sobre la importante función social que realiza y expone que, de eliminarse la colegiación compulsoria no podría cumplir sus propósitos. En apoyo, alega que en 1997, la Asamblea Legislativa eliminó el requisito de colegiación compulsoria y después tuvo que reinstaurarlo precisamente porque eliminarlo impactó negativamente la labor de la entidad. De igual modo, expresa que la Junta ha enfrentado señalamientos del Contralor de Puerto Rico por no contar con un inventario ni un plan de

retención para los expedientes médicos. Asimismo, afirma que la Junta tiene un atraso en la gestión de asuntos éticos y de impericia médica. Por esa razón, el Colegio aduce que esta no puede considerarse un medio menos oneroso.

En contraposición, el doctor Delucca Jiménez reitera que el Colegio y el Estado no demostraron que la colegiación compulsoria es imprescindible por no existir otra alternativa menos restrictiva para adelantar el interés apremiante esbozado. Asimismo, enfatiza que, en este caso la Junta es el organismo que rige la profesión médica y, por ende, el medio menos restrictivo para lograr los objetivos del Gobierno. A su vez, hace hincapié en que todas las funciones de carácter social que desempeña el Colegio, aunque son encomiables, no justifican la obligatoriedad de su membresía. Finalmente, el Doctor Delucca Jiménez expresa que el Colegio incurre repetidamente en expresiones políticas con las que no se solidariza.

Por otro lado, la Asociación de Abogados de Puerto Rico y la Asociación Médica de Puerto Rico comparecieron como amigos de la corte. En su *amicus curiae*, la Asociación de Abogados de Puerto Rico expresa que la colegiación compulsoria no es el mecanismo menos restrictivo para adelantar cualquier interés del Estado en la regulación profesional de la medicina. De forma similar, la Asociación Médica de Puerto Rico esboza que la colegiación compulsoria es inconstitucional. Para apoyar su postura, destaca que el

Colegio no tiene facultades regulatorias sobre los médicos y que la Junta es el organismo encomendado a salvaguardar el fin público de regular el ejercicio de la mencionada profesión. Asimismo, la Asociación Médica puntualiza que desde 1902 realiza una labor equivalente al Colegio y que no es válido obligar a la clase médica a pertenecer a una asociación por encima de otras que ejercen funciones análogas.

Con el beneficio de la comparecencia de las partes y los *amicii curiae*, nos encontramos en posición de resolver la controversia ante nos.

II

A. *Libertad de asociación en Puerto Rico*

La Carta de derechos de la Constitución de Puerto Rico consagra de manera expresa que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. PR, LPRA, Tomo 1, ed. 2016, pág. 299. Esta garantía constitucional se ha reconocido como un derecho fundamental que está directamente relacionado con la libertad humana y la democracia. Rodríguez Casillas *et al.* v. Colegio, 202 DPR 428, 433 (2019).

Como una extensión lógica del derecho de las personas a asociarse libremente, reconocimos también su derecho a no asociarse. Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR

791, 811-812 (2014). A su vez, tras realizar una exégesis de este derecho, concluimos que la Constitución local consigna una especie de protección distinta y de mayor amplitud a la que se reconoce al amparo de la Constitución de Estados Unidos. Íd., pág. 811. Por esa razón, al disponer de estas controversias "resolvemos por fundamentos locales adecuados e independientes al derecho constitucional federal de libertad de asociación". Rodríguez Casillas *et al.* v. Colegio, supra, pág. 455.

Por otra parte, en el ejercicio de su poder de razón de Estado, la Asamblea Legislativa tiene la facultad de regular y controlar la práctica de las profesiones, salvo la abogacía, a fin de proteger la salud y el bienestar público. Íd. pág. 440. Respecto al alcance de esa potestad, explicamos que "[e]l Estado puede establecer unos requisitos de conocimientos mínimos, capacidad, destreza, entereza moral o cualquier otro **que esté racionalmente relacionado con el objetivo de garantizar que los examinados posean la competencia para practicar la profesión en forma adecuada**". (Negrilla suplida). Rodríguez Casillas *et al*. v. Colegio, supra, pág. 428; Marcano v. Departamento Estado, 163 DPR 778, 786 (2005). Sin embargo, no se pueden violar derechos fundamentales so pretexto de esta amplia facultad discrecional. Rodríguez Casillas *et al*. v. Colegio, supra, pág. 440.

En fiel apego a la norma constitucional, este Tribunal pautó que la colegiación compulsoria de un grupo profesional crea una fricción inevitable con el derecho de libertad de asociación de sus integrantes. Íd., pág. 448. Así, por tratarse de un derecho fundamental, la interferencia gubernamental únicamente puede validarse si logra superar el escrutinio estricto. Rodríguez Casillas *et al*. v. Colegio, supra, pág. 455.

Al aplicar el escrutinio estricto, se invierte el peso de la prueba y se presume que la medida impugnada es inconstitucional. San Miguel Lorenzana v. ELA, 134 DPR 405, 425 (1993). De ese modo, para superar el crisol constitucional, el Estado está obligado a **articular la existencia de un interés apremiante que justifique la necesidad de su actuación**. Rivera Schatz v. ELA y C. Abo. PR II, supra, págs. 813-814. Sin embargo, el estándar probatorio no solo requiere que la acción estatal persiga un interés apremiante, sino que exige también que el Estado demuestre que no tiene medidas menos restrictivas para adelantar ese interés. Íd., págs. 814-815. Dicho de otro modo, el Estado únicamente podrá interferir con un derecho fundamental cuando no le quede otra opción. Rodríguez Casillas *et al.* v. Colegio, supra, pág. 433. "Solo de esa manera se protege adecuadamente un derecho tan fundamental como el de la libertad de asociación". Rivera Schatz v. ELA y C. Abo. PR II, supra, págs. 813-814.

Recientemente, en el caso <u>Vélez Colón v. Colegio de Optómetras y otros</u>, 2023 TSPR 78, 212 DPR __ (2023), decretamos la inconstitucionalidad de la disposición estatutaria que obligaba a los optómetras a ser miembros del Colegio de Optómetras para ejercer válidamente su profesión en Puerto Rico. Allí, luego de examinar con el debido rigor las leyes que reglamentaban esa profesión, concluimos que la colegiación compulsoria no era indispensable, ya que la Junta Examinadora es el único organismo regulador del ejercicio de la optometría y a su vez, el ente encargado de adelantar los intereses del Estado. <u>Íd</u>., pág. 24.

B. *Junta de Licenciamiento y Disciplina Médica*

Por otro lado, la Ley Núm. 139, aprobada el 1 de agosto de 2008, 20 LPRA sec. 131, *et seq*., según enmendada, conocida como la Ley de la Junta de Licenciamiento y Disciplina Médica, es el estatuto rector de la profesión médica en Puerto Rico.

En su exposición de motivos, el legislador consignó que la "sociedad tiene un interés de primera jerarquía en la integridad de la profesión médica. Para velar por dicho interés social, el Estado tiene el derecho de reglamentar la práctica de la profesión. Uno de los mecanismos más importantes para lograr este fin es el proceso de licenciamiento para ejercer la profesión". Exposición de motivos de la Ley Núm. 139-2008. A su vez, la Asamblea Legislativa explicó que la aprobación del estatuto respondió

a la insuficiencia de su antecesora, la Ley Núm. 22 de 22 de abril de 1931, para lograr el interés apremiante del Estado, así como las quejas en cuanto a la administración del Tribunal Examinador de Médicos. Íd. En específico, se expresó:

> La Ley Núm. 22 de 22 de abril de 1931 creó el Tribunal Examinador de Médicos de Puerto Rico. La misma fue originalmente aprobada en el 1931 y con el transcurso de los años ha sido enmendada en múltiples ocasiones. Dichas enmiendas, algunas inconexas, hacen de la ley vigente una arcaica, disfuncional y ajena a las tendencias modernas de regulación de la práctica de la profesión médica.
> . . .
>
> Recientemente hemos visto cómo el deterioro propiciado por la disfuncionalidad de la ley ha propiciado serios problemas relacionados con la práctica de la medicina en Puerto Rico. De igual forma existen muchas quejas relacionadas con la administración del Tribunal Examinador de Médicos.
> . . .
>
> La Ley Núm. 22 de 22 de abril de 1931, según enmendada, fue el comienzo de tal protección a la salud y bienestar general, pero al presente su texto no ha sido lo suficiente para obligar a los funcionarios a cargo de la misma a cumplir con su responsabilidad ética y social. Es necesaria la intervención de esta Asamblea Legislativa para atender este asunto de primera prioridad. Exposición de motivos de la Ley Núm. 139-2008

Con lo anterior en mente, la Ley Núm. 139-2008, supra, estableció un nuevo esquema para regular la práctica de la medicina en Puerto Rico. Como parte de esa gesta, se instauró la Junta de Licenciamiento y Disciplina Médica adscrita al Departamento de Salud. Art. 3 de la Ley Núm. 139-2008, 20 LPRA sec. 132. Así, se dispuso que "[e]l Departamento de Salud será responsable de asegurarse que se cumpla con la

política pública de que es al Estado al que le compete licenciar y disciplinar los profesionales médicos". Íd.

Entre las extensas facultades que le fueron conferidas a la Junta cabe destacar:

a. adoptar un sello oficial.

. . .

j. enmendar, rechazar o aprobar el Código de Ética para los Médicos en Puerto Rico, conforme a lo dispuesto en la Ley Núm. 77 de 13 de agosto de 1994;

k. establecer mediante reglamento los requisitos de educación continua que podrán tomar los médicos y aprobar los cursos que se ofrezcan a tales fines.

l. Establecer procedimientos de investigaciones y celebración de vistas administrativas relacionadas a la conducta de los tenedores de la licencia de Médicos Asistentes concedida en virtud de esta Ley.

m. Ofrecer cursos de educación continuada para la renovación de la licencia de Médicos Asistentes emitida en virtud de esta Ley.

n. Preparar y administrar exámenes de reválida a ser aprobados para el ejercicio de la profesión de Médico Asistente.

o. Establecer la reglamentación necesaria para la implantación de esta legislación.

p. Garantizar la licencia de Médico Asistente a aquella persona que reúna los requisitos de esta Ley.

q. Promover investigaciones sobre el desempeño de los miembros de la profesión de Médico Asistente.

r. Denegar o revocar cualquier licencia emitida en virtud de esta Ley si se determinase que algún aspirante al ejercicio de la profesión o algún Médico Asistente licenciado carece de buena reputación según definido en esta Ley. En caso de que la Junta revoque o deniegue una licencia bajo este fundamento, deberá notificar por escrito a la

persona en cuestión de su derecho a apelar al Tribunal de Apelaciones, dentro del término de treinta (30) días contados a partir de la notificación de la revocación o denegatoria.

s. Garantizar que el requisito de educación se cumpla antes de la emisión de la licencia.

t. Otorgar certificaciones, las cuales tendrán un término de vigencia de cuatro (4) años, que acrediten los cursos en educación continuada para garantizar los conocimientos en el campo de Médicos Asistentes, así como las teorías y práctica de las comunicaciones y cualquier otra materia que la Junta tenga a bien incluir.

u. En cualquier momento, en que la Junta estime que alguna persona o empresa pública o privada incurra en actuaciones o prácticas que puedan constituir una violación a esta Ley, podrá denunciar dichos actos ante un tribunal con competencia y solicitar o interponer un interdicto o cualquier acción legal necesaria para detener dicha práctica.
. . .

Art. 4 de la Ley Núm. 139-2008, 20 LPRA sec. 132a.

De forma similar, entre la exhaustiva lista de deberes y responsabilidades de la Junta, están: (1) promulgar reglas y reglamentos justos e imparciales; (2) seleccionar y/o administrar exámenes de licenciamiento; (3) recibir, investigar y adjudicar querellas; (4) iniciar procesos de investigación motu proprio e imponer multas, previa celebración de una vista, por violaciones a las leyes de la práctica de la medicina; (5) emitir citaciones, emplazamientos, administrar juramentos, recibir testimonios y conducir vistas; (6) desarrollar e implantar métodos para evaluar y mejorar la práctica de los médicos; (7) proponer recomendaciones a la Asamblea Legislativa para realizar

enmiendas a la ley para beneficio de la salud, la seguridad y el bienestar público, y (8) desarrollar y adoptar su presupuesto. Art. 8 de la Ley Núm. 139-2008, 20 LPRA sec. 132e. Sobre este último punto, a grandes rasgos, el estatuto dispone que la Junta se sostendrá a base de los ingresos generados por sus actividades, incluyendo honorarios, cargos y reembolsos. Art. 39 de la Ley Núm. 139-2008, 20 LPRA sec. 135h.

Como medida protectora, la Junta puede expedir órdenes de cese y desista para evitar que cualquier persona, asociación o corporación viole cualquier provisión del estatuto. Art 28(g) de la Ley Núm. 139-2008, 20 LPRA sec. 134b.

A fin de evaluar y fiscalizar el desempeño de esta entidad, la Junta viene obligada a presentar al Gobernador y al Secretario de Salud un informe anual sobre sus labores, en el que rinda cuentas sobre el número de solicitudes y licencias expedidas, y sus gastos e ingresos. Art. 31 de la Ley Núm. 139-2008, 20 LPRA sec. 135a. Asimismo, deberá rendir un informe anual sobre la cantidad de querellas presentadas contra médicos u osteópatas, los casos adjudicados judicialmente y aquellos transigidos judicial o extra judicialmente. Art. 32 de la Ley Núm. 139-2008, 20 LPRA sec. 135a.

C. *Colegio de Médicos Cirujanos de Puerto Rico*

Por otra parte, la Ley Núm. 77 de 13 de agosto de 1994, 20 LPRA sec. 73, *et seq.*, según enmendada, conocida como la Ley del Colegio de Médicos-Cirujanos de Puerto Rico autorizó la creación del organismo antes mencionado.

En la Exposición de Motivos, se consignó:

> El Colegio cuya creación se autoriza en esta medida tendrá como propósitos que se vigile adecuadamente por la conservación y el mejoramiento de calidad en el ejercicio de la medicina que hemos experimentado en Puerto Rico; se fomente el continuo progreso de la medicina; se divulguen conocimientos médicos; se eleven las normas de la educación médica; se recaben la aprobación y el cumplimiento de leyes meritorias en relación con la salud y consecución del bienestar de todos nuestros conciudadanos y de la profesión médica; se logre que el médico sea de la mayor utilidad posible para el pueblo en la prevención y curación de las enfermedades y con relación a los problemas de la asistencia médica y los servicios médicos hospitalarios; se fomente que los médicos se desarrollen e interrelacionen en todas las fases de sus labores; se desarrollen y estrechen las relaciones de cordialidad entre los miembros de la profesión médica; y se colabore con el Tribunal Examinador de Médicos en los procesos disciplinarios por violaciones de ley y normas éticas. Exposición de motivos de la Ley Núm. 77-1994.

Entre las facultades que le fueron conferidas a esta entidad se encuentra:

A. Subsistir y operar bajo ese nombre.

B. Demandar y ser demandado como persona jurídica.

C. Poseer y usar un sello oficial que podrá alterar a su voluntad según se disponga por su Reglamento.

D. Adquirir derechos y bienes, tanto muebles como inmuebles, por donación, legado, tributos entre sus propios miembros, compra o de otro modo legal; poseerlos, hipotecarlos, arrendarlos y disponer de los mismos en cualquier forma legal y de conformidad con su Reglamento.

E. Tomar dinero a préstamo, y constituir y dar garantías para el pago de los mismos.

F. Adoptar su Reglamento y para enmendarlo en la forma y con los requisitos que en el mismo se provea, garantizando siempre los derechos individuales de los colegiados.

G. Proponer al Tribunal Examinador de Médicos las enmiendas al Código de Cánones de Ética Profesional que estime necesarias para promover la mejor salud y bienestar del pueblo y la excelencia de los colegiados en el ejercicio de la medicina; y enmiendas a los procedimientos para recibir, **investigar preliminarmente y referir al Tribunal Examinador las querellas** que se formulen respecto a la práctica y conducta profesional de los colegiados para que éste imponga las sanciones aplicables, si así procede. Toda proposición para enmendar, revisar íntegramente o derogar el Código de Cánones de Ética Profesional e instituir otro nuevo, será presentada al Tribunal Examinador, el cual deberá pasar juicio sobre cada proposición a los fines de aprobarla, rechazarla, modificarla o considerarla, conforme a su criterio. **El Tribunal Examinador podrá, sin embargo, aprobar, revisar o enmendar el Código de Cánones de Ética Profesional con independencia de cualquier proposición o falta de ella que haga al efecto el Colegio.**

H. Proteger a sus miembros, promover su desarrollo profesional y disponer la creación de sistemas de seguros y fondos especiales y otros de protección voluntaria.

. . .

Art. 4 de la Ley Núm. 77-1994, 20 LPRA sec. 73c.

Es menester aclarar que el estatuto habilitador del Colegio de Médicos no ha sido enmendado para atemperarse a las disposiciones de la Ley Núm. 139-2008, supra, y por lo tanto, su texto hace alusión al antiguo Tribunal Examinador de Médicos en lugar de la Junta de Licenciamiento y Disciplina Médica, que es el ente rector vigente.

Dicho esto, en lo concerniente al poder de recibir e investigar las quejas que se formulen sobre sus miembros, si el Colegio, luego de dar la oportunidad a las partes interesadas de ser oídos, encuentra causa fundada de posible conducta ilegal o antiética, debe referir el expediente a la Junta con sus observaciones. Art. 20 de la Ley Núm. 77-1994, LPRA sec. 73e. Empero, nada de lo dispuesto en el estatuto limita o altera la facultad de la Junta para iniciar cualquier procedimiento por su propia cuenta. Íd.

En lo atinente a la controversia aquí planteada, la Ley Núm. 77-1994 dispone que ninguna persona podrá ejercer la medicina en Puerto Rico sin ser miembro del Colegio de Médicos. Art. 7 de la Ley Núm. 77-1994, 20 LPRA sec. 73f. De lo contrario, estará sujeta a ser sancionada con pena de multa no menor de $100 ni mayor de $500. Art. 13 de la Ley Núm. 77-1994, 20 LPRA sec. 73o.

III

Ciertamente, la regulación de la práctica médica constituye un interés estatal apremiante estrechamente vinculado a la salud pública. Al analizar las particularidades de esta controversia, no pasamos por alto la preeminencia de la profesión médica y su rol vital de atención y cuidado a la salud de las personas. Históricamente, esa ha sido precisamente una de las razones medulares por las que hemos validado que la Asamblea Legislativa, en su ejercicio de poder de razón de Estado,

establezca los estándares que deben regir la práctica de las distintas profesiones. Rodríguez Casillas *et al.* v. Colegio, supra, pág. 440. Sin embargo, ese ejercicio de poder estatal debe ceñirse al mandato constitucional.

Aquí, indiscutiblemente, la colegiación obligatoria para ejercer legítimamente la medicina en Puerto Rico incide sobre el derecho a la libertad de asociación de los integrantes de la mencionada profesión. Por eso, este Foro, como máximo intérprete y guardián de nuestra Constitución, está en la obligación de someter esa intromisión estatal al rigor del escrutinio estricto.

En esa encomienda, no podemos perder de perspectiva que la primacía del interés apremiante, por sí misma, no justifica la lesión de derechos fundamentales. Por eso, independientemente de los poderosos intereses que promuevan la acción estatal que incide sobre derechos individuales, se requiere a su vez, que esta sea la única alternativa para conseguir esos fines. Rivera Schatz v. ELA y C. Abo. PR II, supra, pág. 813. De ahí que, la controversia planteada se circunscribe a determinar si el Estado no tiene una alternativa menos intrusiva para adelantar el interés apremiante de regular el ejercicio de la medicina y así, preservar la salud pública.

Aclarado este extremo, resulta evidente que obligar a los médicos a ser miembros de una asociación no es el mecanismo menos restrictivo al alcance del Estado para

lograr sus objetivos. La realidad es que, en este caso, la colegiación obligatoria no es necesaria para sostener el esquema regulador de la medicina y preservar la salud pública.

Sin lugar a duda, la Junta de Licenciamiento es la entidad llamada a adelantar el interés apremiante antes discutido. De hecho, la Ley Núm. 139-2008, supra, que instauró este organismo, estructuró todo un nuevo esquema para regular la medicina, precisamente, en reconocimiento de que el anterior no era suficiente para lograr los objetivos del Estado. Durante ese proceso de redefinición de la práctica médica, la Ley Núm. 77-1994, supra, que creó el Colegio permaneció inalterada. En contraste, la Asamblea Legislativa entendió que era necesario gestar un ente apropiado para regular la profesión y ofrecer garantías al pueblo con relación a la profesión médica. Exposición de Motivos de la Ley Núm. 139-2008, supra.

Así las cosas, la Junta es el único organismo encomendado por ley a regular la práctica médica en Puerto Rico. Art. 4 de la Ley Núm. 139-2008, 20 LPRA sec. 132a. Consecuentemente, es esta entidad quien puede expedir, renovar o suspender cualquier licencia. Íd. Ese proceso de licenciamiento, según describe la Exposición de motivos de la Ley Núm. 139-2008, supra, es uno de los mecanismos más importantes para lograr la integridad de la profesión médica. En esa tarea, la Junta administra los exámenes de

reválida y es quien se encarga de reglamentar de forma exhaustiva los requisitos que debe satisfacer un aspirante. Art. 7 de la Ley Núm. 139-2008, 20 LPRA sec. 132d.

En lo concerniente al ámbito disciplinario, la Junta es la entidad que adopta y aplica los cánones de ética de la profesión. Art. 8 de la Ley Núm. 139-2008, 20 LPRA sec. 132e. También puede iniciar procedimientos de investigación *motu proprio* e imponer multas por violaciones a las leyes y reglamentos que viene encargada de administrar. Íd. A su vez es quien único, mediante un procedimiento formal, tiene la potestad de tomar medidas disciplinarias como la suspensión o revocación de una licencia. Art. 4 de la Ley Núm. 139-2008, 20 LPRA sec. 132a. En apoyo a esa función, el Colegio tiene la facultad de recibir e investigar quejas que se formulen sobre la conducta de sus miembros, y de referir estos asuntos a la atención de la Junta. Art. 6 de la Ley Núm. 77-1994, 20 LPRA sec. 73e. Sin embargo, esa facultad no limita la autoridad de la Junta de iniciar estos procedimientos por su propia cuenta. Íd.

A lo largo de este pleito, el Colegio ha insistido en que la colegiación compulsoria es indispensable porque la Asamblea Legislativa le delegó unas "funciones públicas" que, aunque no están intrínsecamente relacionadas con la regulación de la profesión, son esenciales para proteger la salud pública. Esa aserción, no se ajusta al análisis constitucional vigente. En controversias de esta naturaleza,

el interés apremiante de resguardar la salud del pueblo debe analizarse en el contexto de la reglamentación profesional y no como un fin independiente. La colegiación compulsoria es un requisito de licenciamiento profesional, y por tanto, debe responder únicamente al interés apremiante de regular el ejercicio de una profesión.

No obstante, de una evaluación integral de la Ley Núm. 77-1994, supra, es inescapable concluir que el Colegio de Médicos esencialmente ostenta las facultades y deberes características de una asociación profesional o de una entidad sin fines de lucro. En términos generales, su rol se circunscribe a: proteger a sus miembros; instituir programas de servicio a la comunidad; subvencionar estudios científicos; fomentar el mejoramiento del ejercicio de la medicina y los servicios médicos; ofrecer cursos de educación continua, y colaborar con el Gobierno y otras asociaciones en beneficio del bienestar público. Arts. 4-5 de la Ley Núm. 77-1994, supra, 20 LPRA secs. 73c-73d.

Estos objetivos son loables e importantes. Sin embargo, y sin afán de menospreciar su rol social, esas facultades extrínsecas a la regulación de la profesión no superan el crisol constitucional. El Colegio, como muchas otras organizaciones, puede implementar medidas que contribuyan a preservar la salud pública. No por eso se justifica obligar a las personas a ser miembros de estas entidades para obtener una licencia profesional.

No se justifica que todos los médicos estén obligados a asociarse al Colegio para que este pueda realizar clínicas de vacunación, pruebas gratuitas de Covid-19, distribuir medicamentos o mantener un centro de llamadas. Por más encomiable que resulte su gesta, el sostenimiento de esa función social no puede ser a expensas del derecho de asociación de los galenos.

Finalmente, reconocemos el rol colaborativo del Colegio en lo concerniente a proponer enmiendas a los cánones de ética profesional y ofrecer cursos de educación médica continua. Art. 4 de la Ley Núm. 77-1994, 20 LPRA sec. 73c. Empero, no es necesaria la colegiación compulsoria para que el Colegio proponga las enmiendas que entienda necesarias a las reglas éticas y mucho menos para que sea un proveedor de educación continua, como lo son muchas otras organizaciones avaladas por la Junta. Y es que, eliminar la obligatoriedad de la membresía al Colegio no es eliminar el Colegio mismo. Esa entidad puede subsistir como una de membresía voluntaria, y como lo han hecho otros Colegios luego de un decreto de inconstitucionalidad del requisito de membresía obligatoria.

Aquí no hay ni un solo interés apremiante que no se pueda adelantar sin obligar a los médicos a asociarse con quien no desean. Es más, el surgimiento de una colegiación voluntaria, que es lo único que conlleva un decreto de inconstitucionalidad, no afectaría de forma alguna el

esquema regulador de la medicina diseñado por la Asamblea Legislativa. La colegiación compulsoria de los médicos es a lo sumo, conveniente, pero de ningún modo indispensable. Difícilmente se podría argumentar que los objetivos que el Estado promueve con este requisito de afiliación, que ni siquiera están directamente relacionados con la regulación de la profesión médica, no se pueden conseguir de una forma menos lesiva. La conveniencia no puede anteponerse al mandato constitucional.

Al igual que en Rivera Schatz v. ELA y C. Abo. PR II, supra; Rodríguez Casillas *et al.* v. Colegio, supra, y Vélez Colón v. Colegio de Optómetras y otros, supra, en este caso, es mediante las facultades delegadas a la Junta de Licenciamiento y no a través de la colegiación compulsoria, que el Estado adelanta su interés apremiante de regular la profesión médica, sin menoscabar el derecho de este gremio.

IV

Por los fundamentos expuestos, se confirma la sentencia del Tribunal de Apelaciones y se decreta la inconstitucionalidad de la colegiación compulsoria establecida por los Arts. 7, 8 y 13 de la Ley Núm. 77-1994, 20 LPRA secs. 73f, 73g y 73o.

Se dictará Sentencia de conformidad.

RAFAEL L. MARTINEZ TORRES
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO


Héctor Luis Delucca Jiménez

    Apelado


    v.                            AC-2022-0083

Colegio de Médicos Cirujanos
de Puerto Rico y otros

    Apelantes


SENTENCIA

En San Juan, Puerto Rico, a 2 de octubre de 2023.

Por los fundamentos expuestos en la Opinión que antecede, la cual se hace formar parte de esta Sentencia, se confirma la sentencia del Tribunal de Apelaciones y se decreta la inconstitucionalidad de la colegiación compulsoria establecida por los Arts. 7, 8 y 13 de la Ley Núm. 77-1994, 20 LPRA secs. 73f, 73g y 73o.

Lo acordó el Tribunal y certifica el Secretario del Tribunal Supremo. El Juez Asociado señor Rivera García emitió una Opinión de conformidad. La Jueza Presidenta Oronoz Rodríguez emitió una Opinión disidente. El Juez Asociado señor Colón Pérez emitió una Opinión disidente. El Juez Asociado señor Estrella Martínez disintió sin opinión escrita.


Javier O. Sepúlveda Rodríguez
Secretario del Tribunal Supremo

| Héctor Luis Delucca Jiménez | | |
|---|---|---|
| Apelado | | |
| v. | AC-2022-0083 | |
| Colegio de Médicos Cirujanos de Puerto Rico y otros | | |
| Apelantes | | |

**Opinión de conformidad emitida por el Juez Asociado señor Rivera García**

En San Juan, Puerto Rico, a 2 de octubre de 2023.

El aseguramiento de una robusta salud pública representa uno de los fines primordiales del estado moderno. Como parte de esa gesta, resulta indispensable exigir los más altos estándares en las profesiones que adelantan esa causa. Bajo ese entendido, no hay duda alguna de que el interés público en regular efectivamente la profesión médica cede pocas veces ante otros intereses sociales.

No obstante, el poder estatal para supervisar el ejercicio de una profesión no supone una autoridad irrestricta para establecer requisitos **que no sirvan un propósito significativo**, en detrimento del derecho de un individuo a no asociarse con una organización cuya membresía objeta. Cónsono con mi criterio reiterado en casos de esta naturaleza, la colegiación compulsoria, como medida de reglamentación profesional, no supera el crisol de nuestra Carta Magna **cuando representa una exigencia redundante dentro del esquema profesional aplicable**.

Tras examinar los argumentos ante nos, coincido con el criterio mayoritario respecto a que la colegiación compulsoria de los médicos puertorriqueños representa un menoscabo fútil de su derecho a la no asociación. Máxime, **cuando el esquema regulatorio no depende en forma alguna de la participación del Colegio de Médicos Cirujanos de Puerto Rico (CMCPR).**

A fin de cuentas, la discusión no es si esta medida obligatoria sirve para adelantar la salud pública en un sentido abstracto o general. Tampoco, si sostiene las actividades sociales y benéficas de un gremio profesional. Más bien, **debe examinarse únicamente bajo el supuesto de si es o no necesaria para adelantar el poderoso interés gubernamental en regular el ejercicio de la medicina.**

De este modo, difícilmente puede afirmarse que la colegiación compulsoria es el medio menos oneroso al derecho agraviado y que adelante el crucial interés público en la reglamentación efectiva de la medicina. Por estos motivos, estoy conforme en decretar la inconstitucionalidad de la colegiación compulsoria de los médicos en Puerto Rico.

I

**A.** *Derecho a la no asociación y la colegiación compulsoria*

El derecho a la asociación surge expresamente de nuestra Constitución. Allí se preceptúa que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin

lícito, salvo en organizaciones militares o cuasi militares".[1] Ciertamente, la preeminencia de este derecho en nuestra jurisdicción no se discute, pues obedece a una intención de reconocer un derecho distinto a aquel que surge de la Constitución federal.[2]

En fiel apego a los valores que protege esta garantía constitucional, desde hace décadas este Foro reconoció que el derecho a la asociación supone necesariamente el derecho a no asociarse.[3] Al así hacerlo, hemos sido enfáticos que nuestra discusión respecto a este derecho constitucional se enmarca en los confines de la Constitución de Puerto Rico, como **fundamento estatal adecuado e independiente**.[4]

Ahora bien, sobre este derecho constitucional no había sido objeto de mayor discusión hasta nuestra *Opinión* en *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791 (2014). Allí, nos expresamos sobre el esquema de colegiación compulsoria que se le había impuesto en nuestra jurisdicción a los abogados. Amparados <u>**exclusivamente en nuestro poder inherente para reglamentar la profesión legal**</u>, declaramos inconstitucionales ciertas disposiciones de la Ley Núm. 109-2014, las cuales habían reestablecido la colegiación compulsoria de los letrados.[5]

---

[1] Const. P.R., Art. II, Sec. 6.
[2] *Rivera Schatz v. ELA y C. Abo. PR II*, 191 DPR 791, 810-11 (2014).
[3] *Íd.,* págs. 811-12 (citando a *Colegio de Abogados v. Schneider*, 112 DPR 540 (1982)).
[4] *Íd.,* pág. 809 (Invocando la doctrina de *Michigan v. Long*, 463 US 1032 (1983)).
[5] *Íd.,* pág. 795.

Fue nuestro criterio que la reimposición de la colegiación compulsoria a los abogados representaba una intromisión inconstitucional en la esfera delegada a este Tribunal por nuestra Carta Magna.[6] Además, estimamos, que como Foro rector poseíamos las herramientas necesarias para salvaguardar el buen funcionamiento de la justicia en Puerto Rico.[7] Al evaluar la improcedencia del esquema de colegiación compulsoria de la profesión legal, indicamos que "los abogados son un grupo de profesionales *sui géneris* que, *contrario a otros grupos profesionales*, están fiscalizados por un ente permanente que los regula de manera independiente a cualquier grupo profesional o colegio".[8] (Énfasis en el original).

Ahora bien, como parte de nuestra exposición del derecho, también nos expresamos sobre las imbricaciones constitucionales del requerimiento de asociación a una organización, como precondición para ejercer una profesión.[9] Ya en *Colegio de Abogados v. ELA*, 181 DPR 135, 137 (2011), mediante *Resolución*, habíamos adelantado que

> es la colegiación compulsoria de una clase profesional la que crea una fricción inevitable con la libertad de asociación de los afectados. Por ello, esa limitación significativa de la libertad a no asociarse es constitucional solamente si el Estado demuestra un interés gubernamental apremiante que la hace necesaria.[10]

---

[6] *Íd.*, pág. 821.
[7] *Íd.*
[8] *Íd.*, págs. 816-17.
[9] *Rivera Schatz v. ELA y C. Abo. PR II*, supra, pág. 809.
[10] *Colegio de Abogados v. ELA*, 181 DPR 135, 137 (2011).

Así, en *Rivera Schatz v. ELA y C. Abo. PR II*, supra, reconocimos que una medida que incida sobre este derecho fundamental deberá representar no solamente un interés apremiante del Estado, sino que debe ser el medio menos oneroso para la consecución de ese fin.[11]

Posteriormente, este Foro tuvo una segunda ocasión para atender una controversia sobre un esquema de colegiación compulsoria en *Rodríguez Casillas et al v. Colegio*, 202 DPR 428 (2019). Allí, resolvimos que nuestra discusión en *Rivera Schatz v. ELA II,* supra, sobre el derecho a la no asociación, era extensiva a otras profesiones.[12] Consecuentemente, reiteramos que cualquier actuación estatal que interfiriera con el ejercicio del derecho a la asociación debería sobrepasar, para su validez, un escrutinio constitucional estricto.[13] Ello, presupone la existencia de un interés apremiante que haga la actuación necesaria y que el Estado no tenga a su alcance medidas menos onerosas para lograr el interés articulado.[14]

Según concluimos, **en el contexto particular de los técnicos y mecánicos automotrices**, aunque existía un interés apremiante del Estado, la colegiación compulsoria no era el medio menos oneroso.[15] Así, recurrimos a un análisis detallado de las disposiciones que crearon la Junta

---

[11] *Rivera Schatz v. ELA y C. Abo. PR II*, supra, pág. 813.
[12] *Rodríguez Casillas et al v. Colegio*, 202 DPR 428, 451 (2019).
[13] *Íd.*, pág. 449-50.
[14] *Íd.*, pág. 450.
[15] *Íd.*, pág. 452.

Examinadora de Técnicos y Mecánicos Automotrices y el Colegio de Técnicos y Mecánicos Automotrices de Puerto Rico. Al comparar estas disposiciones, estimamos que sería mediante el buen ejercicio de las facultades delegadas a esa junta examinadora que se lograrían mantener estándares altos en esa profesión.[16]

Destaco, que en esa ocasión el compañero Juez Asociado señor Estrella Martínez apuntaló, que era "necesario enfatizar que el esquema de colegiación compulsoria invalidado en este *caso particular* no necesariamente corresponde a la realidad de las profesiones restantes en Puerto Rico".[17] (Énfasis en el original). Lo anterior, pues la regulación de las diversas profesiones es un asunto que **no puede tratarse homogéneamente.**[18]

En lo sucesivo, esta Curia ha tenido otras oportunidades para revisitar el tema de la colegiación compulsoria. En esas instancias, he reafirmado infatigablemente la necesidad de incorporar al análisis un componente práctico y contextualizado.[19] En términos concretos, me refiero a la necesidad de precisar las características que debe exhibir un método alterno a la colegiación compulsoria, para que pueda decretarse la

---

[16] *Íd.*, pág. 452.
[17] *Íd.*, pág. 457. (Expresión concurrente, J. Estrella Martínez).
[18] *Íd.*
[19] Véanse, *Colegio de Veterinarios v. Veterinario Express et al*, supra. (Opinión concurrente, J. Rivera García); *Reyes Sorto et al v. CIAPR,* 2023 TSPR 62, 211 DPR __ (2023) (Opinión de conformidad, J. Rivera García) *y Negrón Román y otros v. Col. CPA y otros*, 2023 TSPR 87, 212 DPR __ (2023), (Opinión de conformidad, J. Rivera García).

inconstitucionalidad de esta última. Por ello, insisto que la determinación sobre si efectivamente existe un medio menos oneroso requiere, responsablemente, determinar que esa alternativa es **viable y efectiva.**

No obstante, ya en *Col. Vet. v. Veterinario Express et al*, supra, adelanté que cuando la reglamentación de una profesión demuestre que puede operar efectivamente sin necesidad de una colegiación compulsoria, la ausencia de esta resulta una alternativa viable.[20] Esto se manifiesta con absoluta claridad cuando la prueba demuestra que el rol del colegio profesional **"no es el de ejercer funciones de otro modo pertenecientes al Estado, sino el de complementar las ya ejercidas por la Junta Examinadora".**[21] (Negrillas suplidas). Igual criterio reiteré en ocasión de considerar la colegiación compulsoria impuesta a los optómetras.[22]

**B.** *Ley de la Junta de Licenciamiento y Disciplina Médica*

El poder para regular la profesión médica en Puerto Rico ha sido investido por disposición estatutaria en la Junta de Licenciamiento y Disciplina Médica (JLDM), en virtud de su ley orgánica.[23] Así lo afirma expresamente el Artículo 7 del estatuto al indicar que la "Junta tendrá a su cargo la autorización, en el Estado Libre Asociado de

---

[20] *Colegio de Veterinarios v. Veterinario Express et al*, supra, pág. 562.
[21] *Íd.*, pág. 567.
[22] *Vélez et al v. Col. Optómetras et al*, 2023 TSPR 78, 212 DPR ___ (2023) (Opinión de conformidad, J. Rivera García).
[23] Ley de la Junta de Licenciamiento y Disciplina Médica, Ley Núm. 139-2008, 20 LPRA sec. 131 *et seq.*

Puerto Rico, del ejercicio de la profesión de médico cirujano y osteópata".[24] Dice, además, que la "Junta tendrá facultad para denegar, suspender, cancelar o revocar cualquier licencia y para emitir una orden fijando a un médico un período de prueba por un tiempo determinado".[25]

En cuantos a sus facultades, destaco que este ente público puede: (1) enmendar, rechazar o aprobar el Código de Ética para los Médicos en Puerto Rico; (2) establecer los requisitos de educación continua y aprobar los cursos a esos fines; (3) establecer procesos de investigación y celebración de vista administrativas contra los tenedores de licencias; (4) preparar y administrar exámenes de reválida y (4) denegar y revocar cualquier licencia emitida en virtud de esa ley por motivo de carencia de buena reputación.[26] La JLDM también establece los requisitos que debe cumplir un aspirante a la profesión de la medicina,[27] incluyendo requisitos adicionales para los médicos graduados en facultades en el extranjero.[28]

Por otro lado, la JLDM tiene una extensa facultad disciplinaria respecto a los médicos licenciados en Puerto Rico y para denunciar, además, aquellos individuos que se encuentren incursos en la práctica ilícita de la medicina. Esto incluye la facultad para, a iniciativa propia o tras

---

[24] 20 LPRA sec. 132d.
[25] *Íd.*
[26] 20 LPRA sec. 132a.
[27] 20 LPRA sec. 133b.
[28] 20 LPRA sec. 133d.

una querella, referir al Departamento de Justicia una conducta para su investigación.[29] Destaco, que la JLDM puede suspender a un médico por una multiplicidad de razones detalladas en ley, entre las cuales figura la ausencia de prueba sobre una póliza de responsabilidad financiera, según exigida por el Art. 41.050 del Código de Seguros de Puerto Rico.[30]

**C.** *Ley del Colegio de Médicos-Cirujanos de Puerto Rico*

La colegiación compulsoria de los médicos en Puerto Rico tiene su origen en la Ley del Colegio de Médicos-Cirujanos de Puerto Rico[31]. En virtud de este estatuto, nuestra Asamblea Legislativa facultó a los galenos a constituirse como ente jurídico, sujeto a la celebración de una asamblea de los médicos licenciados en ese momento.[32] Su Artículo 8, recoge la obligación que tienen los médicos en Puerto Rico de colegiarse para poder ejercer la medicina en nuestra jurisdicción.[33]

Como hemos reseñado en ocasiones previas, el CMCPR ostenta una serie de facultades que son comunes a los entes jurídicos. A saber: (1) demandar y ser demandado bajo ese nombre, (2) poseer y usar un sello oficial, (3) adquirir derechos y bienes, (4) tomar dinero a préstamo, entre

---

[29] 20 LPRA sec. 134.
[30] *Íd.*
[31] Ley Núm. 77-1994, 20 LPRA sec. 73 *et seq.*
[32] 20 LPRA sec. 73b.
[33] 20 LPRA sec. 73g.

otras.[34] Ademas, posee facultad para **proponer "al Tribunal Examinador de Médicos las enmiendas al Código de Cánones de Ética Profesional** que estime necesarias...".[35] (Negrillas suplidas). Puede **proponer también "enmiendas a los procedimientos para recibir, investigar preliminarmente y referir al Tribunal Examinador las querellas** que se formulen respecto a la práctica y conducta profesional de los colegiados para que éste imponga las sanciones aplicables".[36] (Negrillas suplidas).

No obstante, la ley aclara inmediatamente que "[e]l Tribunal Examinador podrá, sin embargo, aprobar, revisar o enmendar el Código de Cánones de Ética Profesional con independencia de cualquier proposición o falta de ella que haga al efecto el Colegio".[37] De este modo, la Ley expresa en términos claros que **la facultad que posee el CMCPR en estas materias no le confiere autoridad alguna para obligar a la JLDM a adoptar los cambios propuestos.**

Esto se repite nuevamente en la esfera de la ética profesional. Aquí, el CMCPR tiene facultad para recibir e investigar quejas y, de encontrar causa fundada, referir el expediente a la JLDM con sus observaciones y recomendaciones.[38] Nótese, que distinto a otras profesiones

---

[34] 20 LPRA sec. 73c.
[35] *Íd*. Estas disposiciones hacen referencia al antiguo Tribunal Examinador de Médicos, sustituido por la Junta de Licenciamiento y Disciplina Médica, en virtud de la Ley Núm. 139-2008, *supra*.
[36] *Íd*.
[37] *Íd*.
[38] 20 LPRA sec. 73e.

previamente examinadas por este Tribunal, **la autoridad legal del CMCPR ni siquiera le permite impartir sanciones a sus miembros**. Solamente pueda remitir el asunto a la JLDM.

La Ley igualmente le reconoce varios deberes aspiracionales al CMCPR, los cuales, por su propia redacción, no implican autoridad expresa o implícita alguna para regular la profesión.[39] Además, el estatuto faculta al CMCPR a establecer una Fundación para instrumentar programas de servicios a la comunidad.[40] También, se le reconoce al CMCPR la facultad para proveer entrenamiento y cursos de educación continua a sus miembros.[41]

II

Como cuestión de umbral, precisa esclarecer la naturaleza real de este caso. Esto es, si la colegiación compulsoria de los médicos en Puerto Rico, como medida de reglamentación profesional, es constitucionalmente viable. Lo anterior, bajo la doctrina reiterada de este Foro, a los efectos de que **el derecho a no asociarse, <u>si bien no es de carácter absoluto</u>, cede únicamente cuando se articula la existencia de un interés apremiante del Estado y se prueba, además, que la medida impugnada representa el medio menos oneroso para la consecución de ese interés.**

---

[39] 20 LPRA sec. 73d.
[40] 20 LPRA sec. 73c.
[41] *Íd.*

La historia de estos litigios demuestra que la correcta ubicación de estos casos debe atenerse a la necesidad o no de esta medida como parte de la fiscalización de una determinada profesión. Por ello, consigno mi rechazo a cualquier propuesta que tendría el efecto de reconceptualizar estas controversias bajo intereses ajenos a la reglamentación profesional.

Como he sostenido reiteradamente, la colegiación compulsoria de una profesión sobrevive o desaparece tras concretarse un análisis constitucional de escrutinio estricto, matizado por las consideraciones prácticas sobre la viabilidad de la alternativa propuesta al esquema regulatorio bajo examinación. Además, no ha sido la práctica de este Tribunal considerar la constitucionalidad de una colegiación obligatoria bajo la premisa de si el colegio que se beneficia de esta medida asiste al Estado en alguna actividad o esfuerzo social de sustancial importancia.

El propósito, después de todo, no es defender la colegiación por la trascendencia que le podamos adscribir a un colegio particular o a los loables menesteres que este ejecute. Si hay o no otras actividades —ajenas a la reglamentación profesional— para las cuales el Estado determine depender de un colegio profesional, estas resultan del todo impertinentes para adjudicar la validez constitucional de una colegiación compulsoria.

Establecido lo anterior, resta únicamente considerar si la colegiación compulsoria aquí impugnada supera los exigentes requisitos constitucionales que este Foro ha promulgado. En ese sentido, no hay duda alguna que la primera parte del escrutinio estricto queda enteramente satisfecha. Ciertamente, el Gobierno de Puerto Rico posee y acredita un poderosísimo interés en la reglamentación efectiva de la medicina.

Es evidente y conocida la importancia de la profesión médica como piedra angular de una sociedad de avanzada y garante de los más altos estándares de salubridad pública. En el adelantamiento de esa causa, resulta enteramente aceptable que el Estado requiera de los médicos que deseen practicar lícitamente en nuestra jurisdicción una serie de cualificaciones que acrediten su aptitud profesional.

Es por ello que la Ley Núm. 177-2008, *supra*, establece los distintos requisitos que se le exigen a un doctor en medicina para obtener su licencia en Puerto Rico. Entre ellos, aprobar una reválida, mantener un nivel determinado de educación continua, obtener una póliza de seguro contra negligencia profesional y cumplir con unos rigurosos estándares de probidad moral y ética.

Ahora bien, es precisamente al examinar estos requisitos que surge con meridiana claridad la identidad de a quién se le ha investido con facultad para ejercer esta función fiscalizadora. Un examen básico de la Ley de la

Junta de Licenciamiento y Disciplina Médica, *supra*, confirma que **es esa entidad y ninguna otra, quien ostenta la <u>totalidad de las funciones reglamentarias de la medicina en Puerto Rico</u>**. Con eso nada más, el caso de marras se torna totalmente distinguible de las medidas de colegiación compulsorias vigentes en las profesiones de la ingeniería y la agrimensura y en la de los contadores públicos autorizados.

Vale recabar, que la colegiación compulsoria de los ingenieros y agrimensores procede de un sistema de reglamentación profesional **compartida** entre el Estado y el colegio, como entidad cuasipública.[42] Allí, el Colegio de Ingenieros y Agrimensores de Puerto Rico opera, para todo efecto práctico, las actividades atinentes a la fiscalización ética y el cumplimiento con los requisitos de educación continua.[43] La Junta Examinadora de Ingenieros y Agrimensores se perfila como un ente prácticamente inoperante y que, más aún, se opuso a los intentos legislativos de eliminar la colegiación compulsoria.[44]

En el caso de los contadores públicos autorizados, el modelo regulatorio parte de la premisa de que la Junta de Contabilidad ha ejercido consistente unas funciones mínimas. Añádase, que **el historial de esa profesión evidencia un patrón de delegar facultades** a la *National Association of*

---

[42]*Reyes Sorto et al v. CIAPR,* 2023 TSPR 62, 211 DPR __ (2023) (Opinión de conformidad, J. Rivera García, pág. 37).
[43] *Íd.,* pág. 38.
[44] *Íd.*

*State Boards of Accountancy* y al Colegio de Contadores Públicos Autorizados de Puerto Rico.[45] Esto último, como parte del reconocimiento expreso del rol crucial del gremio en la función de encausamiento ético y en el cumplimiento de la encomienda legislativa para inspeccionar las bitácoras de los contadores.[46]

De este modo, no puede sostenerse que el CMCPR tenga alguna injerencia en la reglamentación de la profesión médica. Esa ha sido una realidad histórica que hoy queda recogida en palabras inconfundibles en la ley orgánica de la Junta de Licenciamiento y Disciplina Médica, *supra*. En estas circunstancias, la situación fáctica y legal se asemeja al caso resuelto recientemente sobre la colegiación compulsoria de los optómetras.[47]

La colegiación compulsoria de los médicos cirujanos opera entonces como un requisito estatutario sin fin apreciable que lo justifique. En circunstancias como estas, me reafirmo en el criterio jurídico que he esbozado. De este modo, al recurrir a la segunda parte del escrutinio estricto, la existencia o no de un medio menos oneroso, forzosamente debo concluir que el medio menos oneroso ya existe, pues se trata precisamente del esquema vigente.

---

[45] *Negrón Román y otros v. Col. CPA y otros*, 2023 TSPR 87, 212 DPR __ (2023), (Opinión de conformidad, J. Rivera García, págs. 9-11).
[46] *Íd.*, págs. 13-14.
[47] *Vélez et al v. Col. Optómetras et al*, supra.

Evidentemente, la ausencia de la colegiación compulsoria no afecta en forma alguna la estructuración del modelo regulatorio en la medicina. Exigir este requisito, que innecesariamente menoscaba el derecho a no asociarse sin cumplir con los requisitos para ello, representa un desenlace impermisible en nuestro ordenamiento constitucional. Ante ello, procede el decreto de inconstitucionalidad.

Edgardo Rivera García
Juez Asociado

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Héctor Luis Delucca Jiménez

    Apelado

      v.                          AC-2022-0083

Colegio de Médicos Cirujanos
de Puerto Rico y otros

    Apelantes

La Jueza Presidenta Oronoz Rodríguez emitió una Opinión disidente

En San Juan, Puerto Rico, a 2 de octubre de 2023.

Como parte de una sucesión de pronunciamientos dirigidos a menoscabar las medidas legisladas para salvaguardar la salud pública de la comunidad puertorriqueña,[1] una vez más, mis compañeros y compañera de estrado se enfrascaron en un ejercicio adjudicativo de carácter autómata. Esta vez, la emprendieron en contra de la colegiación compulsoria de la clase médica. Al dejar sin efecto la asociación obligatoria de estos profesionales, dan al traste con un mecanismo que ha probado ser efectivo en varios frentes, como sería promover la calidad de la prestación de servicios a toda

---

[1] No debemos olvidar los casos de Vélez Colón v. Colegio de Optómetras, 2023 TSPR 78, 212 DPR ___ (2023) y Colegio de Médicos Veterinarios v. Veterinario Express, 210 DPR 527 (2022), y mi postura en estos.

la ciudadanía, promover la práctica ética de la profesión, proteger la salud pública y promover los adelantos de la profesión, exaltando las nuevas tendencias y la actualización del conocimiento.

Esta acción es contraria a la realidad de las operaciones cotidianas del colegio profesional en cuestión y la respectiva junta examinadora, y, además, se toma de espaldas a la evidencia histórica. A fin de cuentas, el saldo de este proceder perjudicará —directa o indirectamente— la manera en que la ciudadanía recibe sus servicios de salud. Lamentablemente, perdimos la ocasión para refrendar la constitucionalidad de la colegiación compulsoria de los médicos cirujanos, en beneficio de ese bien tan preciado e indispensable para toda persona, irrespectivo de su género, raza, edad o condición económica y social: la salud.

Por los fundamentos que expongo a continuación, disiento del curso de acción mayoritario. Soy del criterio que la medida que nos correspondía justipreciar sobrevive el escrutinio constitucional aplicable.

**I**

El Dr. Héctor Luis Delucca Jiménez (doctor Delucca Jiménez) presentó una demanda de sentencia declaratoria en contra del Estado Libre Asociado de Puerto Rico y el Colegio de Médicos Cirujanos de Puerto Rico (Colegio) solicitando que se decretara la inconstitucionalidad de la colegiación compulsoria de los médicos cirujanos. Alegó que era un médico autorizado en Puerto Rico con licencia vigente otorgada por

la Junta de Licenciamiento y Disciplina Médica (Junta) adscrita al Departamento de Salud de Puerto Rico; que cumplía con todos los requisitos para ejercer la profesión de médico en Puerto Rico; que las leyes aplicables le exigían ser miembro del Colegio; que no quería pertenecer al Colegio, y que su obligatoriedad para ganarse la vida lesionaba su derecho constitucional de libertad de asociación y expresión.

El doctor Delucca Jiménez argumentó que, según lo resuelto en Rodríguez Casillas et al. v. Colegio, 202 DPR 428 (2019) y Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791 (2014), cuando una ley establecía un requisito de colegiación compulsoria, se tenía que aplicar un escrutinio estricto, lo cual requería probar un interés apremiante para ello y que no existía otra medida menos onerosa para proteger ese interés. Adujo que la Ley Núm. 77-1994, según enmendada, 20 LPRA sec. 73 et seq. (Ley Núm. 77), estatuto que crea al Colegio, no proveía o evidenciaba un interés apremiante para lesionar su derecho constitucional, que los fines legítimos de la Ley Núm. 77, supra, se podían cumplir sin obligar a los médicos a asociarse al Colegio y que existían mecanismos menos onerosos para regular esta profesión. Sobre este último punto, apuntó a que la Junta, creada en virtud de la Ley Núm. 39-2008, según enmendada 20 LPRA sec. 131, et seq., tenía facultades investigativas, fiscalizadoras, disciplinarias y de licenciatura. Por estas razones, solicitó que la colegiación compulsoria de los médicos se declarara inconstitucional.

Posteriormente, el 6 de junio de 2020 el doctor Delucca Jiménez presentó una *Moción en solicitud de sentencia sumaria*. En esta, sostuvo que la colegiación compulsoria de los médicos era inconstitucional pues violentaba el derecho constitucional del demandante de ganarse la vida y practicar su profesión sin tener que claudicar a su derecho de libertad de asociación. En particular, planteó tres hechos materiales no controvertidos que, a su juicio, eran suficientes para concluir mediante dictamen declaratorio sumario que la colegiación compulsoria de los médicos era inconstitucional: 1) el demandante era médico licenciado en Puerto Rico; 2) para cumplir con los requisitos legales para practicar la medicina en Puerto Rico, el demandante era miembro del Colegio; y, 3) en Puerto Rico la ley exige que para practicar la profesión de médico se tiene que estar colegiado al Colegio. En síntesis, el doctor Delucca Jiménez aseveró que no existía un interés apremiante para lesionar el derecho constitucional de los médicos en Puerto Rico y que existían mecanismos menos onerosos para regular la profesión de los médicos, como la Junta.

Por su parte, el 22 de julio de 2020 el Estado presentó una *Moción de sentencia sumaria*. Solicitó que el foro primario dictara una sentencia sumaria en la que se sostuviera la colegiación compulsoria cuestionada. Por un lado, el Estado reconoció que no era constitucionalmente permisible que se le impusiera la colegiación compulsoria a un ciudadano en detrimento de su derecho constitucional a libertad de

asociación, salvo que se articulara la existencia de un interés apremiante y se probara que el Estado no tenía a su alcance medidas menos onerosas que la legislada para lograr el interés articulado. Sin embargo, expresó que lo anterior no implicaba que el Estado no tuviera la facultad de regular y controlar las prácticas de las profesiones a fin de proteger la salud y el bienestar público, siempre y cuando el Estado superara un escrutinio estricto. Sobre esto, planteó que el Estado tenía un interés apremiante de reglamentar la profesión, así como de mejorar los servicios ofrecidos al público. En particular, enfatizó que las funciones primordiales del Colegio eran ayudar al mejoramiento de la salud en Puerto Rico y cooperar con los gobiernos municipales, y con el gobierno estatal y federal y sus agencias e instrumentalidades públicas en el diseño de la implantación de la política pública sobre la salud en Puerto Rico.

En su *Moción de sentencia sumaria,* el Estado proveyó como ejemplo de los deberes relacionados, no con la regulación de la profesión en sí, sino con proteger la salud y el bienestar público, el rol del Colegio en el manejo de la pandemia ocasionada por el COVID-19. Sobre esto, el Estado enfatizó la importancia de las labores que llevó a cabo el Colegio. Por ejemplo, el Colegio organizó un centro de llamadas para orientar a miles de ciudadanos sobre las medidas y los protocolos necesarios para proteger la seguridad, salud y vida de todos al atender casos sospechosos de COVID-19. El Estado reconoció que el Colegio trabajó arduamente en orientar y

brindar información a la comunidad durante esta crisis de salud pública.

Finalmente, el Estado planteó que, tras hacer el análisis de escrutinio estricto, el derecho a la libertad de asociación cedía ante el interés apremiante que tenía el Estado de promover y velar por la seguridad, salud, bienestar general, vida y dignidad de todos los ciudadanos de Puerto Rico que recibían algún servicio de un profesional de la salud como lo eran los médicos cirujanos. Además, destacó que este caso en particular versaba sobre una profesión de la salud que era delicada y que una falla de un médico podía causarle la vida a un paciente. Tras exponer sus argumentos, el Estado solicitó que el foro primario validara la colegiación compulsoria del Colegio.

Por otro lado, el 13 de agosto de 2020 el Colegio presentó una *Respuesta del [Colegio] a la moción de sentencia sumaria*. En esta, el Colegio planteó que la colegiación compulsoria de los médicos cirujanos cumplía con el crisol constitucional, por lo que la solicitud de sentencia sumaria que presentó el doctor Delucca Jiménez era improcedente. En su escrito, el Colegio resaltó que, más que regular la profesión, la existencia de esta entidad con membresía obligatoria era parte del esquema establecido por el Estado para salvaguardar la salud pública. El Colegio argumentó que este hecho resultaba ser evidente tras examinar las facultades que se le otorgaron y las obligaciones que se le impusieron cuando fue creado. Además, esbozó que este mismo ejercicio llevaba a la

conclusión forzosa que el Colegio no era una imagen virtual de la Junta. Esto así, pues, si bien era cierto que el Colegio tenía facultades y obligaciones que apoyaban la gestión reguladora de la Junta, de las quince obligaciones que se le imponían al Colegio en el art. 5 de la Ley Núm. 77, _supra_, nueve de ellas son obligaciones de carácter estrictamente público. Estas eran:

> (a) Ayudar al mejoramiento de la salud del pueblo de Puerto Rico.
>
> (b) Fomentar el mejoramiento del ejercicio de la medicina.
>
> (c) Promover y divulgar el continuo progreso de la medicina.
>
> (d) Cooperar con los gobiernos municipales, estatal y federal, y sus agencias, instrumentalidades públicas y organismos reguladores, en el diseño y la implantación de la política pública sobre la salud en Puerto Rico, cuando sean requerido para ello.
>
> (e) Colaborar para que la prestación de los servicios médico-hospitalarios en Puerto Rico sean de la misma calidad para todo individuo, independientemente de su condición económica, raza, color, origen, religión, sexo o credo político.
> .   .   .   .   .   .   .   .   .
> (g) Defender la confidencialidad de la relación entre médico y paciente, de conformidad con los parámetros dispuestos en la legislación aplicable;
> .   .   .   .   .   .   .   .   .
> (i) Orientar a la comunidad sobre problemas de la salud pública y de asistencia médica;
>
> (j) Instar a que el médico sea de la mayor utilidad posible para nuestro pueblo en la prevención de las enfermedades, así como parte del mejoramiento de la calidad de vida;
>
> (k) Cooperar con los organismos gubernamentales y las entidades privadas correspondientes y orientar a la comunidad para alcanzar el mayor grado de razonabilidad posible en los costos de los servicios de salud. 20 LPRA sec. 73d.

Además, el Colegio apuntó al hecho de que estos deberes de índole pública surgían como la razón principal para la reinstauración de la colegiación compulsoria de los médicos cirujanos, luego de que se dejara sin efecto el referido requisito en el 1997. A estos efectos, citó la Exposición de Motivos de la Ley Núm. 56 del 13 de julio de 2001: "los problemas que enfrenta nuestro pueblo en el área de la salud requieren de un Colegio de Médicos-Cirujanos fuerte y vigoroso que pueda ayudar al Gobierno y a la sociedad en general a la solución de los mismos, para lo cual es de gran interés público restablecer la colegiación obligatoria para la clase médica". Exposición de Motivos de la Ley Núm. 56 de 13 de julio de 2001 (2001 [Parte 1] Leyes de Puerto Rico 269, 271).

En su escrito, el Colegio proveyó tres ejemplos concretos de actuaciones que había tomado para hacer valer sus deberes de índole público. En primer lugar, la Asamblea Legislativa específicamente autorizó al Colegio a crear una corporación sin fines de lucro para instrumentar sus programas de servicio a la comunidad, la cual en efecto se creó y a la cual se le asignó por lo menos el 3% de las cuotas que recibía el Colegio. Según el Colegio, esta corporación —la Fundación del Colegio de Médicos Cirujanos de Puerto Rico— ha desempeñado un rol protagónico en la salud pública de Puerto Rico, y se ha destacado por sus orientaciones al público sobre enfermedades infecciosas y las clínicas de vacunación de influenza y de pruebas de COVID-19. Además, el Colegio indicó que, tras el paso del Huracán María y de los terremotos del área sur, la

Fundación del Colegio de Médicos Cirujanos de Puerto Rico fue designada por el Departamento de Salud como repositorio del Banco de Medicamentos, a cargo de la administración y distribución de estos durante misiones de médicos que visitaron diferentes puntos de la Isla que habían quedado sin acceso a cuidado médico.

En segundo lugar, el Colegio destacó que creó el Instituto de Investigación Clínica y Desarrollo Tecnológico, que tenía a su cargo programas y actividades dirigidas a educar, promover, fomentar, facilitar e impulsar estudios científicos tanto en el área clínica como en el área de tecnología que contribuyan al adelanto de la salud pública de Puerto Rico. Finalmente, el Colegio indicó que asesoraba regularmente a la Asamblea Legislativa, sometiendo ponencias y testificando ante comisiones legislativas en asuntos de salud sobre los cuales la legislatura requería asesoramiento. En concreto, en el año y medio previo a la presentación de su escrito, el Colegio había sometido más de cincuenta ponencias ante la legislatura, además de participar como integrante de múltiples comisiones, comités y juntas de gobierno.

El Colegio concluyó que era parte integral e indispensable del esquema a través del cual el Estado promovía su interés apremiante en el bienestar y la salud pública. Aseveró, pues, que en el balance de los intereses envueltos —tanto de los profesionales autorizados, el del Estado, y el del Pueblo— la colegiación compulsoria de los médicos cirujanos cumplía con el crisol constitucional.

El 18 de agosto de 2020 el doctor Delucca Jiménez presentó una *Réplica a escritos de codemandados en relación a la solicitud de sentencia sumaria*. En este, argumentaron que los demandados fallaron en identificar un interés apremiante para exigir la colegiación compulsoria y que no discutieron la existencia de otro mecanismo para lograr el fin perseguido sin lesionar el derecho de libertad de asociación de los médicos cirujanos. Sobre este último punto, el doctor Delucca Jiménez planteó que las aportaciones del Colegio se podrían realizar sin obligar a los médicos a pertenecer a dicha organización. Añadió que el Estado siempre podía reforzar y ampliar las facultades de la Junta. Esto, argumenta, constituía un mecanismo menos oneroso. Por otro lado, argumentó que las razones de la Asamblea Legislativa para establecer la colegiación compulsoria nuevamente en el año 2001, según surgen de la Exposición de Motivos de la Ley Núm. 56-2001, <u>supra</u>, no cumplían con los requisitos jurisprudenciales expuestos a partir del año 2014. Finalmente, destacó que un decreto de inconstitucionalidad de la colegiación compulsoria no sería sinónimo de la eliminación del Colegio.

En respuesta, el Estado presentó una *Réplica a oposición a moción de sentencia sumaria* el 3 de septiembre de 2020. En su breve escrito, el Estado reiteró su postura a favor de la constitucionalidad de la colegiación compulsoria de los médicos cirujanos. Enfatizó la necesidad de la colegiación compulsoria, máxime con la situación de emergencia de salud

causada por el COVID-19, en vista de que una de sus funciones primordiales era ayudar al mejoramiento de la salud en Puerto Rico y cooperar con los gobiernos en el diseño e implementación de la política pública sobre la salud en Puerto Rico.

El mismo día, el Colegio presentó una *Dúplica del [Colegio] a la moción de sentencia sumaria*. Argumentó en contra de la alegación del doctor Delucca Jiménez en cuanto a que las aportaciones del Colegio se podrían realizar sin obligar a los médicos a pertenecer a dicha asociación. Apuntó al hecho de que en la Exposición de Motivos de la Ley Núm. 56-2001, supra, la Asamblea Legislativa expresamente determinó que la descolegiación de los médicos cirujanos en el 1994 causó un disloque en las aportaciones que el Colegio podía hacer para salvaguardar la salud pública. Esto, arguyó el Colegio, era reflejo de que las obligaciones de índole pública requerían de un colegio más financieramente robusto, de modo que pudiera ayudar al Estado a salvaguardar la salud pública, y para eso era necesaria la colegiación compulsoria.

Así las cosas, el Tribunal de Primera Instancia dictó una *Sentencia* el 18 de septiembre de 2020. El foro primario identificó 41 hechos que fueron admitidos por todas las partes. A tono con estos, el foro primario determinó que el Colegio formaba parte integral e indispensable del esquema a través del cual el Estado promovía su interés apremiante del bienestar y salud pública de Puerto Rico, no solo en teoría sino en la práctica también. Concluyó que el financiamiento

de esta gestión pública como requisito para el licenciamiento de los médicos cirujanos tenía un efecto mínimo en el derecho de asociación de estos. Razonó, además, que la colegiación compulsoria como manera de asegurar el cobro de la cuota y llevar a cabo actividades en apoyo de la gestión del Estado era el método menos oneroso para alcanzar este fin.

Al aplicar el escrutinio estricto, la sala sentenciadora identificó el interés del Estado en salvaguardar la salud pública como uno apremiante y de la más alta jerarquía. Sobre esto, acogió el planteamiento del Colegio sobre el hecho de que este no era una imagen virtual de la Junta. Esto así, porque el Art. 5 de la Ley Núm. 77-1994, supra, le imponía al Colegio un sinnúmero de obligaciones de carácter estrictamente público que no compartía con la Junta. Además, resaltó que los servicios de índole público que había provisto el Colegio surgían como la principal razón de la Asamblea Legislativa para reinstaurar la colegiación compulsoria de los médicos cirujanos en el 2001. Entre estos servicios se encontraban los siguientes: (a) llevar a cabo clínicas de vacunación de influenza y pruebas de COVID-19; (b) servir como repositorio del Banco de Medicamentos tras el paso desastres naturales; y, (c) la labor de asesorar a la Asamblea Legislativa mediante ponencias y testimonios ante comisiones legislativas en asuntos de salud, Finalmente, rechazó la contención del doctor Delucca Jiménez de que las aportaciones del Colegio se podrían realizar sin obligar a los médicos a colegiarse, pues la

Exposición de Motivos de la Ley Núm. 56-2001, supra, desmentían esta aserción.

Por tanto, luego de aplicar el escrutinio estricto, el foro primario resolvió que la colegiación compulsoria de los médicos cirujanos era constitucional.

Inconforme, el doctor Delucca Jiménez recurrió al Tribunal de Apelaciones. Argumentó nuevamente que ser médico licenciado en Puerto Rico, miembro del Colegio y que en Puerto Rico la ley exigía que para practicar la profesión de médico se tenía que ser miembro de la referida entidad, eran hechos suficientes para concluir que la colegiación compulsoria de los médicos era inconstitucional. El galeno adujo también argumentó que el foro inferior erró al confirmar la constitucionalidad de la colegiación compulsoria basándose únicamente en la existencia de un interés apremiante y sin que se demostrase que no existía otra medida menos onerosa para proteger ese interés.

En particular, planteó que las obligaciones de carácter estrictamente público que se le imponían por ley al Colegio se podrían continuar llevando a cabo sin el requisito de colegiación compulsoria. Apuntó al hecho de que la Asamblea Legislativa apoyaba a distintas organizaciones y asociaciones con aportaciones directas cuando entendía que complementaban la gestión del Gobierno. Por ende, el doctor Delucca Jiménez concluyó que la colegiación compulsoria no sobrepasaba el crisol constitucional porque existían otras alternativas para cumplir con el interés apremiante del Estado, dígase:

asignarle fondos adicionales a la Junta, el Colegio u otras organizaciones para que realizaran las labores interesadas por la Asamblea Legislativa.

Por su parte, el Colegio y el Estado comparecieron ante el foro apelativo intermedio y reiteraron los argumentos que habían planteado con anterioridad a favor de la colegiación compulsoria.

El Tribunal de Apelaciones emitió una *Sentencia* mediante la cual revocó el dictamen recurrido. Entendió que el foro primario erró al decretar la constitucionalidad de la colegiación compulsoria de los médicos cirujanos. El foro apelativo intermedio reconoció que salvaguardar el bienestar y la salud del Pueblo de Puerto Rico eran intereses apremiantes del Estado. Sin embargo, entendió que todos los deberes y responsabilidades que se le otorgaron al Colegio, en virtud de la Ley Núm. 77-1994, supra, podían lograrse sin tener que imponer una colegiación compulsoria. A su juicio, el Estado y el Colegio fallaron en demostrar que no existían medidas menos onerosas más allá de imponer la colegiación compulsoria para obtener el financiamiento necesario para alcanzar el interés apremiante que persiguen de salvaguardar la salud y el bienestar público. Finalmente, aseveró que la Junta constituía la medida menos onerosa para proteger los intereses del Estado. Por estas razones, el Tribunal de Apelaciones decretó la inconstitucionalidad de la colegiación compulsoria de los médicos cirujanos establecida en la Ley Núm. 77-1994, supra.

Inconforme, el Colegio recurrió ante nos mediante un recurso de apelación. En esencia, esbozó los argumentos que reprodujo ante el Tribunal de Apelaciones y enfatizó que la historia del Colegio demostraba que no podría cumplir su propósito de asistir al Estado para salvaguardar la salud pública sin la colegiación compulsoria, ya que esta fue la experiencia cuando los médicos fueron descolegiados en el año 1997. Añadió que la Junta ni tan siquiera era capaz de cumplir cabalmente con sus funciones de regular la profesión sin el apoyo del Colegio. Sobre esto, aludió al Informe de la Oficina del Contralor DA-22-08, publicado el 1 de febrero de 2022, relacionado con las operaciones de la Junta. El informe identificó que había 160 casos de conducta no profesional y 408 de impericia médica ante la Junta sin resolver, siendo el caso más antiguo de 2001. Sobre esto, el Colegio apuntó a que, mediante el Consejo de Ética, era responsable de recibir e investigar quejas respecto a la conducta profesional y ética de los médicos, emitía informes con recomendaciones, y refería sus hallazgos a la Junta para su adjudicación final. El costo de toda esa operación la asumía el Colegio. Por ende, argumentó que, ante la realidad de que la operación del Consejo de Ética del Colegio sería económicamente insostenible sin la colegiación compulsoria, sostener la decisión del Tribunal de Apelaciones cargaría aún más a la Junta con casos éticos que no era capaz de resolver oportunamente.

Además, el Colegio apuntó a que el Informe del Contralor identificó que la Junta no contaba con un inventario ni un

plan de retención para los expedientes médicos. El informe indicaba que: "La Junta no cuenta con un inventario ni un plan de retención para los expedientes médicos" y "las instalaciones no contaban con anaqueles suficientes para el archivo de los expedientes de médicos. Estos se colocaban en cajas en el suelo, unas sobre otras, lo cual dificultaba la identificación de documentos".[2] El Colegio argumentó que la ineficiencia de la Junta en el manejo de los expedientes médicos y de los datos necesarios para corroborar el estado de la práctica de la profesión era un problema recurrente que afectaba toda la estructura del sistema de salud, desde los procesos de credencialización para fines de contratación de los médicos por las aseguradoras, hasta la recopilación de las estadísticas necesarias para justificar, a nivel del Congreso de los Estados Unidos, los ajustes de tarifas y aportaciones federales al sistema de salud por áreas geográficas. El Colegio, asimismo, aseveró que actualmente recopilaba y facilitaba esos datos de los médicos porque tenía en su matrícula a todos los médicos licenciados del país. Así, expuso que el Colegio funcionaba como un respaldo que garantizaba la recopilación y conservación de la información y datos de cada uno de los médicos y de la práctica médica.

Por consiguiente, el Colegio arguyó ante esta Curia que, tomando conocimiento de que las funciones y responsabilidades delegadas por ley a la Junta y al Colegio eran distinguibles, y del deplorable estado de las operaciones de esta Junta,

---

[2] Apéndice, pág. 55.

evidenciadas por el informe de la Oficina del Contralor, existían fundamentos suficientes por los que no se podía adjudicar que la Junta era la medida menos onerosa para cumplir con el interés apremiante que justificaba la colegiación compulsoria de los médicos cirujanos.

Por su parte, el doctor Delucca Jiménez reiteró que las disposiciones que le obligaban a formar parte del Colegio eran inconstitucionales porque había una ausencia total de prueba con relación al requisito de ser el medio menos oneroso por no existir otra alternativa para perseguir el interés apremiante esgrimido. Además, planteó que validar la colegiación compulsoria, sería permitir que una organización privada intervenga en asuntos políticos a nombre de todo un grupo profesional con ideologías y formas de pensar distintas. Finalmente, arguyó que la falta de fondos públicos no podía justificar la lesión de un derecho constitucional. De esta forma, solicitó que se confirmara la Sentencia.

Procedo, pues, a discutir el derecho aplicable y detallar cómo hubiese dispuesto del caso ante nos.

## II

### A. Derecho a la libre asociación

El derecho a la libertad de asociación está consagrado expresamente en nuestra Constitución, donde se establece que "[l]as personas podrán asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". Art. II, Sec. 6, Const. ELA, LPRA, Tomo 1, ed. 2016. A pesar de que el derecho constitucional a la libre

asociación se expresa en su vertiente positiva en el texto de la Constitución, este Tribunal también ha reconocido el derecho en su vertiente negativa, dígase, el derecho a no asociarse. Rodríguez Casillas et al. v. Colegio, 202 DPR 428 (2019); Rivera Schatz v. ELA y C. Abo. PR II, 191 DPR 791 (2014). Sin embargo, ni la vertiente positiva de este derecho constitucional ni la negativa constituyen un derecho absoluto, lo cual significa que puede ceder en determinadas circunstancias ante intereses de mayor jerarquía o ante situaciones que revistan un alto interés público. P.N.P. v. De Castro Font II, 172 DPR 883 (2007); P.A.C. v. ELA I, 150 DPR 359 (2000); Democratic Party v. Tribunal Electoral, 107 DPR 1 (1978).

Sobre esto, hemos expresado que cualquier acción del Estado sobre el derecho a la libre asociación está sujeta a un escrutinio estricto. Rivera Schatz v. ELA y C. Abo. PR II, supra, pág. 813; Rodríguez Casillas et al. v. Colegio, supra, págs. 449-450. El análisis que se lleva a cabo en el escrutinio estricto es en extremo riguroso, a tal punto que la ley impugnada se presumirá inconstitucional. Rodríguez Pagán v. Dpto. de Servicios Sociales, 132 DPR 617, 635 (1993). Dicho lo anterior, la Corte Suprema de los Estados Unidos ha reiterado que el escrutinio estricto no es "estricto en teoría, pero fatal en la práctica". (Traducción suplida). Adarand Constructors, Inc. v. Peña, 515 US 200, 237. Vease también: Grutter v. Bollinger, 539 US 306. Por el contrario, el Estado puede legislar de manera que interfiera con este

derecho, siempre y cuando demuestre la existencia de un interés colectivo de superior jerarquía y que la condición promueve su consecución. Rodríguez Pagán v. Dpto. de Servicios Sociales, supra, pág. 635.

Este estándar de revisión judicial requiere evaluar dos criterios; el Estado debe demostrar que: 1) la acción cuestionada sirve un interés gubernamental apremiante; y 2) que no tenía a su alcance una medida menos onerosa para lograr el interés articulado. Rodríguez Casillas v. Colegio, supra, pág. 467; Rivera Schatz v. ELA y C. Abo. PR II, supra, pág. 813; Domínguez Castro v. ELA, 178 DPR 1, 87-88 (2010); Calo Morales v. Cartagena Calo, 129 DPR 102, 133 (1991).

Sobre el primer criterio, es necesario aclarar que el Estado tiene el deber de identificar la existencia de un interés de alta jerarquía y no basta con identificar cualquier tipo de interés gubernamental. Esto resulta claro tras contrastar el hecho de que el escrutinio estricto requiere de un interés apremiante mientras que un interés legítimo es suficiente para el escrutinio racional. Véase: Pérez Román v. Proc. Esp. Rel. de Fam., 148 DPR 201, 212-213 (1999); Rodríguez Rodríguez v. ELA, 130 DPR 562, 582 (1992); San Miguel Lorenzana v. ELA, 134 DPR 405, 425 (1993). Algunos ejemplos de intereses gubernamentales que se han reconocido como apremiantes son: la regulación de distintas profesiones; la salud pública; proteger el bienestar de los menores; investigar y combatir el crimen y mantener la integridad de la rama judicial y la confianza del pueblo en un sistema

judicial imparcial. *Rexach v. Ramírez Velez*, 162 DPR 130 (2004); *El Pueblo de Puerto Rico v. Santiago Feliciano, 139 DPR 361 (1995); Williams-Yulee v. Florida Bar Supreme Court of the United States, 575 US 433 (2015).*

Tras superar el primer escollo del escrutinio estricto, al identificar la existencia de un interés apremiante, el tribunal debe evaluar si existe una medida menos onerosa que la medida impugnada para proteger el interés apremiante. Rodríguez Casillas et al. v. Colegio, supra, pág. 450; Rivera Schatz v. ELA y C. Abo. PR II, supra, pág. 813. La Corte Suprema de los Estados Unidos ha explicado que esto significa evaluar si el acto impugnado es **necesario** para adelantar el interés apremiante que el Estado identificó. City of Richmond v. J.A. Croson Co., 488 US 469, 471 (1989)

Además, la Corte Suprema de los Estados Unidos explicó más a fondo lo que significa evaluar el criterio de la existencia de un medio menos oneroso en U.S. v Playboy Entertainment Group, Inc., 529 US 803 (2000). En ese caso, la Corte Suprema de los Estados Unidos, aplicando el escrutinio estricto, analizó si el Estado contaba con una alternativa menos restrictiva para cumplir con su propósito. En particular, la Corte Suprema evaluó si el medio menos oneroso no solo existía en teoría, sino que evaluó que este fuese efectivo en la práctica. Además, explicó que cuando se plantea la existencia de una alternativa plausible y menos restrictiva que la impugnada, es obligación del Estado probar que esa medida propuesta sería inefectiva en la consecución del

interés adelantado. U.S. v Playboy Entertainment Group, Inc., supra. Es decir, para concluir que existen medidas menos onerosas, no es suficiente apuntar a la existencia de una alternativa que **podría cumplir** con el interés apremiante del Estado, sino que es forzoso evaluar la **viabilidad y efectividad** de las medidas alternativas **para asegurarse que en efecto cumpliría con su propósito**. Este ejercicio analítico lo incorporé en la postura que expresé en Román Negrón v. Colegio de Contadores Públicos Autorizados, 2023 TSPR 87, 212 DPR __ (2023) (Opinión de conformidad de la Jueza Presidenta Oronoz Rodríguez). Véase, también: Reyes Sorto v. ELA, 2023 TSPR 62, 211 DPR __ (2023)(Opinión de conformidad del Juez Asociado señor Rivera García, a la cual se unieron la Jueza Presidenta Oronoz Rodríguez y el Juez Asociado señor Estrella Martínez).

Nótese, además, que este Tribunal también ha hecho expresiones en las cuales se evidencia que ha considerado la viabilidad de una medida alternativa. En Trinidad Hernández v. ELA, 188 DPR 828 (2013), tuvimos la encomienda de evaluar la procedencia de una reforma al Sistema de Retiro, al amparo de la cláusula contra el menoscabo de obligaciones contractuales de nuestra Constitución. El escrutinio aplicable en ese caso requería que la modificación contractual cuestionada, además de ser razonable, debía ser necesaria para adelantar un propósito gubernamental importante. Sobre esto, este Tribunal expresó que "no se sostendrá el menoscabo de una obligación contractual si la parte demandante demuestra

que existen alternativas menos drásticas o severas que las que el legislador escogió para lograr su objetivo". <u>Trinidad Hernández v. ELA</u>, supra, pág. 837. Sin embargo, los allí demandantes alegaron de forma generalizada que existían alternativas menos onerosas, pero no detallaron cómo estas se llevarían a cabo ni si asegurarían la solvencia del Sistema de Retiro. Entonces, este Tribunal concluyó que estos de no demostraron "evidencia para convencer al tribunal en un juicio que estas alternativas **son viables y menos onerosas**". (Énfasis suplido). <u>Trinidad Hernández v. ELA</u>, supra, pág. 838. Aunque no hemos tenido la oportunidad de abundar sobre qué exactamente significa que una alternativa sea o no viable, indudablemente ha sido un factor que se hemos tomado en consideración previamente.

**B. Ley del Colegio de Médicos Cirujanos**

En el 1994, con el propósito disponer la creación y organización del Colegio y especificar sus funciones, facultades y deberes, la Asamblea Legislativa aprobó la Ley Núm. 77-1994, mejor conocida como *Ley del Colegio de Médicos Cirujanos de Puerto Rico*, <u>supra</u>. En la Exposición de Motivos de la referida ley se expone la motivación del Estado para crear el Colegio:

> El Colegio cuya creación se autoriza en esta medida tendrá como propósitos que se vigile adecuadamente por la conservación y el mejoramiento de calidad en el ejercicio de la medicina que hemos experimentado en Puerto Rico; se fomente el continuo progreso de la medicina; se divulguen conocimientos médicos; se eleven las normas de la educación médica; se recaben la aprobación y el cumplimiento de leyes meritorias en relación con la salud y consecución del bienestar

de todos nuestros conciudadanos y de la profesión médica; se logre que el médico sea de la mayor utilidad posible para el pueblo en la prevención y curación de las enfermedades y con relación a los problemas de la asistencia médica y los servicios médicos hospitalarios; se fomente que los médicos se desarrollen e interrelacionen en todas las fases de sus labores; se desarrollen y estrechen las relaciones de cordialidad entre los miembros de la profesión médica; y se colabore con el Tribunal Examinador de Médicos en los procesos disciplinarios por violaciones de ley y normas éticas. Exposición de Motivos de la Ley Núm. 77 de 13 de agosto de 1994 (1994 [Parte 1] Leyes de Puerto Rico 361, 362).

Para hacer valer las razones que motivaron la creación del Colegio, la Asamblea Legislativa enumeró un listado de deberes con los cuales la organización tiene que cumplir:

(a) Ayudar al mejoramiento de la salud del pueblo de Puerto Rico.

(b) Fomentar el mejoramiento del ejercicio de la medicina.

(c) Promover y divulgar el continuo progreso de la medicina.

(d) Cooperar con los gobiernos municipales, estatal y federal, y sus agencias, instrumentalidades públicas y organismos reguladores, en el diseño y la implantación de la política pública sobre la salud en Puerto Rico.

(e) Colaborar para que la prestación de los servicios médico-hospitalarios en Puerto Rico sean de la misma calidad para todo individuo, independientemente de su condición económica, raza, color, origen, religión, sexo o credo político.

(f) Elevar y mantener la dignidad de la profesión y de sus miembros y desalentar, velar y denunciar la práctica desleal y anti-ética en el ejercicio de la profesión.

(g) Defender la confidencialidad de la relación entre médico y paciente, de conformidad con los parámetros dispuestos en la legislación aplicable.

(h) Defender los derechos e inmunidades de los médicos en armonía con el interés público.

(i) Orientar a la comunidad sobre problemas de la salud pública y de asistencia médica.

(j) Instar a que el médico sea de la mayor utilidad posible para nuestro pueblo en la prevención de las enfermedades, así como parte del mejoramiento de la calidad de vida.

(k) Cooperar con los organismos gubernamentales y las entidades privadas correspondientes y orientar a la comunidad para alcanzar el mayor grado de razonabilidad posible en los costos de los servicios de salud.

(l) Establecer, de acuerdo a la capacidad económica del Colegio, medidas de protección mutua para los colegiados.

(m) Estrechar los lazos de amistad y compañerismo entre los colegiados.

(n) Promover el mejoramiento profesional de todos los colegiados mediante la viabilización de la educación médica continua conforme a los criterios establecidos por el Tribunal Examinador y a lo dispuesto en el Artículo 4(L) de esta Ley, y por otros medios.

(o) Tomar las medidas apropiadas, necesarias y convenientes en derecho para hacer efectivos los deberes aquí señalados. 20 LPRA sec. 73d.

Además, la ley orgánica del Colegio detalló las facultades que ostenta el organismo, entre estas:

.   .   .   .   .   .   .   .

(g) Proponer al Tribunal Examinador de Médicos las enmiendas al Código de Cánones de Ética Profesional que estime necesarias para promover la mejor salud y bienestar del pueblo y la excelencia de los colegiados en el ejercicio de la medicina; y enmiendas a los procedimientos para recibir, investigar preliminarmente y referir al Tribunal Examinador las querellas que se formulen respecto a la práctica y conducta profesional de los colegiados para que éste imponga las sanciones aplicables, si así procede. Toda proposición para enmendar, revisar íntegramente o derogar el Código de Cánones

de Ética Profesional e instituir otro nuevo, será presentada al Tribunal Examinador, el cual deberá pasar juicio sobre cada proposición a los fines de aprobarla, rechazarla, modificarla o considerarla, conforme a su criterio. El Tribunal Examinador podrá, sin embargo, aprobar, revisar o enmendar el Código de Cánones de Ética Profesional con independencia de cualquier proposición o falta de ella que haga al efecto el Colegio.

(h) Proteger a sus miembros, promover su desarrollo profesional y disponer la creación de sistemas de seguros y fondos especiales y otros de protección voluntaria.

(i) Instrumentar programas de servicio a la comunidad.

(j) Subvencionar estudios e investigaciones científicas que contribuyan al adelanto de la medicina y la salud pública.

(k) Para instrumentar sus programas de servicios a la comunidad, el Colegio queda autorizado a crear la Fundación del Colegio de Médicos Cirujanos de Puerto Rico, la cual funcionará como una corporación de fines no pecuniarios. No obstante, la Fundación podrá dedicarse a hacer inversiones para cumplir los propósitos del Colegio si así lo autorizan previamente los colegiados reunidos en asamblea. La Fundación proveerá entre otros, programas de servicio a la comunidad, educativos, deportivos, artísticos, culturales y cualesquiera otros de interés social y profesional. El Colegio, previa autorización expresa de los colegiados reunidos en asamblea, podrá traspasar a la Fundación, a título oneroso o gratuito, cualesquiera de sus bienes muebles o inmuebles que el Colegio mismo determine que sea conveniente o necesario para que dicha Fundación cumpla cabalmente con los objetivos y propósitos de su creación.

(l) Ofrecer entrenamiento y cursos de educación médica continua a sus colegiados de las distintas ramas de la profesión médica a través del Instituto de Educación Médica Continua del Colegio de Médicos Cirujanos de Puerto Rico, según las necesidades de los interesados y de conformidad a los requisitos que establezca el Tribunal Examinador de Médicos.

(m) Establecer relación o afiliación con colegios o asociaciones análogas de los Estados Unidos de América u otros países, conforme a las reglas

aplicables de reciprocidad y cortesía.

(n) Crear corporaciones subsidiarias dedicadas a promover los fines y propósitos comprendidos por sus facultades, poderes y política pública.

(o) Ejercer las facultades incidentales que sean necesarias o convenientes a los fines de su creación y funcionamiento y que no estén en conflicto con esta Ley. 20 LPRA sec. 73d.

Nótese que los deberes y facultades, al igual que el propósito de la creación del Colegio, se pueden organizar en dos categorías. Por un lado, una labor importante del Colegio ciertamente está dirigida a la regulación de la profesión. Por el otro, el Colegio tiene una serie de deberes y facultades que no están en nada relacionados con la regulación de la profesión, sino que son de índole estrictamente público y están dirigidos a velar por la salud pública.

Finalmente, es de particular importancia señalar que la referida ley no impuso la colegiación compulsoria, sino que dejó al arbitrio de la comunidad médica escoger, mediante referéndum, si estos deseaban colegiarse compulsoriamente. A estos efectos, se celebró un referéndum en el cual se recibieron 5,603 papeletas para un 69% de los médicos cirujanos con licencia regular y un 80% de estos votaron a favor de la colegiación compulsoria. Dicha cifra ascendió a 4,517 que votaron a favor, lo que constituye un 56% del total de los médicos cirujanos con licencia regular al momento del referéndum. Véase: Exposición de Motivos de la Ley Núm. 56-2001 (2001 [Parte 1] Leyes de Puerto Rico 269, 270).

Tres años más tarde, la Asamblea Legislativa aprobó la

Ley Núm. 129-1997 con el propósito de eliminar la colegiación

compulsoria de la profesión de médicos cirujanos. En la

Exposición de Motivos se detallaron las razones por las cuales

la Asamblea Legislativa decidió deshacer este requisito:

> La experiencia habida desde entonces demuestra que la entidad creada por ley ha carecido del apoyo de los profesionales a los cuales la legislación obligó tanto a quedar afiliados como a mantener con el pago de cuotas que la misma ley ha hecho obligatorias.
>
> Se ha determinado, además, que el Colegio ha incurrido en prácticas administrativas y fiscales que han merecido el repudio de algunos colegiados y de sectores de la sociedad en general.
>
> Ante tal situación, resulta patentemente injusto obligar a todos los profesionales que el Tribunal Examinador de médicos de Puerto Rico ha licenciado debidamente para ejercer la profesión por cumplir con los requisitos que este organismo les requiere en el desempeño de las funciones que le han sido asignadas por la Ley Núm. 22 de 22 del abril de 1931, según enmendada, a también tener que sostener con sus cuotas las actuaciones, las deliberaciones y los gastos de una entidad en la que no interesan participar. Sobre todo, resulta especialmente injusto que, como resultado de no pagar las cuotas del organismo creado por ley, esta misma ley les imposibilite taxativamente el ejercicio de la profesión para la cual ya han obtenido una licencia. Es por ello que la presente pieza legislativa tiene como principal fin eliminar el carácter obligatorio que la legislación objeto de enmienda impuso. Exposición de Motivos de la Ley Núm. 129 de 4 de noviembre de 1997 (1997 [Parte 1] Leyes de Puerto Rico 619-620).

Esta enmienda se hizo sin antes llevar a cabo un

referéndum de la comunidad de médicos cirujanos, a pesar de

que hacía tres años una mayoría de estos había votado a favor

de la colegiación compulsoria.

Cuatro años más tarde, en el 2001, la Asamblea

Legislativa aprobó nuevamente otra ley relacionada con el

Colegio. En esa ocasión, aprobó la Ley Núm. 56-2001 con el propósito de reinstaurar el requisito de colegiación compulsoria. En la Exposición de Motivos de la ley, la Asamblea Legislativa aclaró que la Ley Núm. 129-1997 "derogó ese requisito contra de la voluntad de la gran mayoría de los miembros del Colegio, por razones ajenas a los mejores intereses de la clase médica y de la salud y el bienestar del país en general". Exposición de Motivos de la Ley Núm. 56 de 13 de julio de 2001 (2001 [Parte 1] Leyes de Puerto Rico 269, 270).

Además, la Asamblea Legislativa resaltó las propuestas del Colegio para mejorar los servicios de salud pública como la razón de ser de la organización. Sobre esto, particularizó la importancia de las labores del Colegio mediante su intervención en los problemas de salud del Municipio de Vieques asociados con las ondas de sonido, el cáncer, el efecto del uranio enrarecido y de los metales pesados, junto a la seriedad con que han denunciado los problemas de la Reforma de Salud. Finalmente, reconoció que la eliminación de la colegiación compulsoria fue un error y que "los problemas que enfrenta nuestro pueblo en el área de la salud **requieren de un Colegio de Médicos-Cirujanos fuerte y vigoroso** que pueda ayudar al Gobierno y a la sociedad en general a la solución de los mismos, **para lo cual es de gran interés público restablecer la colegiación obligatoria para la clase médica**". (Énfasis suplido) Íd.

Como se puede observar, el Colegio, a pesar de ser una entidad de relativa reciente creación, ha atravesado por varias etapas con relación al requisito de colegiación compulsoria. En un primer lugar, se dejó la decisión a los propios médicos cirujanos y una mayoría de estos votó a favor de la colegiación compulsoria. Luego, sin llevar a cabo una consulta a la profesión para conocer la posición de la mayoría de los médicos cirujanos al respecto, la Asamblea Legislativa unilateralmente decidió eliminar este requisito. Posteriormente, la Asamblea Legislativa reconoció que la eliminación de este requisito debilitó al Colegio y esto hirió su habilidad de cumplir con sus deberes, particularmente aquellos dirigidos a velar por la salud pública. Ante esta realidad, nuevamente se volvió a instaurar el requisito de colegiación compulsoria con el propósito de robustecer al Colegio y ponerlo en posición de cumplir con su razón de ser.

**C. Junta de Licenciamiento y Disciplina Médica**

Por virtud del poder de razón de Estado (*police power*), la Asamblea Legislativa tiene la facultad de regular y controlar la práctica de las profesiones a los fines de proteger la salud y el bienestar público, así como evitar el fraude y la incompetencia. Rodríguez Casillas et al. v. Colegio, supra, págs. 439-440; Matos v. Junta Examinadora, 165 DPR 741, 754 (2005). En el ejercicio de esa facultad y con el objetivo de velar por el bienestar de la ciudadanía a través de un brazo regulador del Estado que autorice solamente a aquellos profesionales capacitados y responsables con los

estándares médicos vigentes para ejercer la medicina en Puerto Rico, la Asamblea Legislativa aprobó la Ley Núm. 22 de 22 de abril de 1931, *Ley para crear el Tribunal Examinador de Médicos*. Esta ley fue enmendada en múltiples ocasiones y "dichas enmiendas, algunas inconexas, [hicieron] de la ley [...] una arcaica, disfuncional y ajena a las tendencias modernas de regulación de la práctica de la profesión médica". Exposición de Motivos de la Ley Núm. 139 de 1 de agosto de 2008 (2008 [Parte 2] Leyes de Puerto Rico 718,719). Por esta razón, la Asamblea Legislativa aprobó la Ley Núm. 139-2008, *Ley de la Junta de Licenciamiento y Disciplina Médica*, 20 LPRA sec. 131 *et seq.*

A través de esta ley se creó la Junta con siete (7) miembros nombrados por el Gobernador de Puerto Rico quienes, entre otros requisitos, deberán poseer un título de Doctor en Medicina y una licencia regular para ejercer su profesión, y haber practicado activamente su profesión en Puerto Rico por lo menos durante siete (7) años previo al nombramiento.

La Junta tiene diversas facultades delegadas por ley, entre ellas: 1) enmendar, rechazar o aprobar el Código de Ética para los Médicos en Puerto Rico; 2) establecer mediante reglamento los requisitos de educación continua que podrán tomar los médicos y aprobar los cursos que se ofrezcan a tales fines; 3) establecer procedimientos de investigaciones y celebración de vistas administrativas relacionadas con la conducta de los tenedores de la licencia de Médicos Asistentes concedida en virtud de esta ley; 4) ofrecer cursos de

educación continuada para la renovación de la licencia de Médicos Asistentes emitida en virtud de esta ley, y 5) Preparar y administrar exámenes de reválida a ser aprobados para el ejercicio de la profesión de Médico Asistente. 20 LPRA sec. 132a.

La ley, además, le impone una serie de responsabilidades a la Junta. Entre estas, se encuentran las siguientes: 1) Evaluar la educación médica y los entrenamientos de los candidatos; 2) valuar la experiencia profesional previa de los candidatos; 3) emitir o denegar licencias iniciales o licencias aprobadas; 4) mantener seguros y completos los expedientes de los licenciados; 5) aprobar o denegar por justa causa las solicitudes de renovación de licencia; 6) desarrollar e implantar métodos para identificar a los médicos que violan este estatuto; 7) emitir citaciones, emplazamientos, administrar juramentos, recibir testimonios y conducir vistas; 8) disciplinar licenciados que se encuentren en violación de las leyes y reglamentos sobre la práctica de la medicina; 9) emitir un acuse de recibo de las querellas o cualquier otra información adversa presentada por personas o entidades que adviertan a la Junta y notificar la Resolución final del asunto informado; 10) desarrollar e implantar métodos para identificar médicos incompetentes que fallen en cumplir con los estándares de cuidado de la profesión; 11) desarrollar e implantar métodos para evaluar y mejorar la práctica de los médicos; 12) desarrollar e implantar métodos que aseguren la continuidad de la competencia de los

licenciados; y, 13) iniciar acciones de investigación motu propio e imponer multas por violaciones a las leyes de la práctica de la medicina, disponiéndose que la Junta no podrá imponer multas sin la previa celebración de una vista. 20 LPRA sec. 132e.

Como se puede apreciar, todas las responsabilidades que la Asamblea Legislativa le impuso a la Junta, aunque indirectamente inciden en la salud pública por la naturaleza de la profesión, están dirigidas directamente a cumplir con la regulación efectiva de la profesión de los médicos cirujanos.

**III**

El Colegio solicitó que revisáramos la determinación del foro intermedio que revocó la sentencia del Tribunal de Primera Instancia y, consecuentemente, declaró la inconstitucionalidad del requisito de colegiación compulsoria de los médicos cirujanos de Puerto Rico.

Como señalé, la controversia de autos requería que se analizara a la luz del escrutinio estricto. Es decir, se debe presumir la inconstitucionalidad de la colegiación compulsoria impugnada y es el Estado quien tiene la carga de demostrar la existencia de un interés apremiante y que la colegiación compulsoria es la medida menos onerosa para adelantar el referido interés apremiante.

El primer paso de este análisis exige identificar el interés apremiante que el Estado ha buscado adelantar al imponer la colegiación compulsoria de los médicos cirujanos.

En el caso del Colegio, existen dos intereses apremiantes. Primero, ya este Tribunal ha establecido que el Estado tiene un interés apremiante de regular las profesiones a los fines de que se le provean a la ciudadanía servicios de alta calidad y competencia; en particular, expresamos que la Asamblea Legislativa tiene la facultad de regular y controlar la práctica de las profesiones, salvo la jurídica, a fin de proteger la salud y el bienestar público, así como evitar el fraude y la incompetencia. Rodríguez Casillas et al. v. Colegio, supra, págs. 439-440; Véase también Accurate Sols. v. Heritage Environmental, 193 DPR 423, 434 (2015); Matos v. Junta Examinadora, 165 DPR 741, 755 (2005).

En el caso específico del Colegio, resulta claro que está diseñado con el propósito de hacer cumplir el cometido del Estado de regular la profesión a través de: 1) sus labores relacionadas con el proceso de disciplina ética de los médicos cirujanos; 2) su responsabilidad como repositorio de datos médicos requeridos por ley, y 3) su rol como proveedor de capacitación y educación continua.

Según esbocé, el Colegio está facultado por ley a recibir e investigar querellas que se formulen respecto a la práctica y conducta de médicos cirujanos colegiados y preparar informes para referir a los profesionales a la Junta. No hay duda de que la Junta está igualmente facultada por ley para llevar a cabo el proceso de disciplina ética sin la intervención del Colegio. Sin embargo, en términos prácticos, resulta evidente que la Junta no podría ser, por sí sola, una medida menos

onerosa que resulte ser viable para regular los asuntos éticos de la profesión. Evidencia de esto son las observaciones que se hicieron como parte del Informe de la Oficina del Contralor DA-22-08, publicado el 1 de febrero de 2022. Ahí, como aludí previamente, se expuso que la Junta tiene 160 casos de conducta no profesional y otros 408 casos de impericia médica sin resolver, siendo el caso más antiguo de 2001.

Al declararse la inconstitucionalidad de la colegiación compulsoria de los médicos cirujanos, el Colegio perderá jurisdicción sobre los médicos cirujanos no colegiados, lo que redundará en que la Junta tendrá que manejar todas las responsabilidades con las que ya está teniendo dificultad para llevar a cabo, más aquellas que el Colegio realiza al presente. Estas preocupantes observaciones hechas en el Informe de la Oficina del Contralor deberían servir como un indicador de que, si incluso con la colaboración del Colegio en el proceso pre-adjudicativo la Junta está tan atrasada en sus funciones, este organismo no será efectivo ni viable para manejar todas estas responsabilidades por sí solo.

Además, nótese que la Asamblea Legislativa, al momento de crear la Junta, diseñó un esquema que reconoce el rol crucial de apoyo a la Junta que tiene el Colegio. Esto resulta particularmente evidente con relación a la responsabilidad de la Junta dirigidas al manejo y la custodia de información de los médicos cirujanos. Sobre esto, el inciso (cc) del Art. 8 de la Ley Núm. 139-2008, establece la responsabilidad de notificar las decisiones disciplinarias, las licencias

denegadas y limitaciones o renuncias voluntarias de licencias por un médico, con cualquier limitación o renuncia que acompañe a una licencia relacionada al licenciado, con cualquier orden emitida por la Junta, determinaciones de hecho y conclusiones de derecho. Asimismo, indica que esta información debe ser remitida al "*Federation Physician Data Center of the Federation of State Medical Boards of the United States*, **al Colegio de Médicos Cirujanos de Puerto Rico** y a cualquier otra entidad que funcione como repositorio de datos requerida por ley". (Énfasis suplido) 20 LPRA sec. 132e. Veamos que la Asamblea Legislativa designó al Colegio como repositorio de información delicada e importante relevante a la regulación de la profesión.

Nuevamente, le correspondía a este Tribunal auscultar si la Junta, por sí sola, resultaba ser el medio menos oneroso para cumplir con estas labores. Del Informe de la Oficina del Contralor surge que la Junta no cuenta con un inventario ni un plan de retención de los expedientes médicos. El informe resalta que esta situación, contraria a la reglamentación vigente, dificulta que los expedientes médicos se mantengan en buen estado y se puedan localizar. **De nuevo, estamos ante una situación en la cual la Junta no tiene la capacidad práctica para llevar a cabo sus deberes y, consecuentemente, no resulta ser una medida viable y efectiva para adelantar el interés apremiante del Estado.**

Finalmente, este Tribunal debió examinar si la Junta puede, en efecto, manejar sus responsabilidades con relación

a la educación continua de los miembros de la profesión. Sobre esto, el Colegio resalta la importancia de entender la complejidad de la representación gremial de la profesión médica. Esto así, ya que esta profesión no es una homogénea, como lo sería, por ejemplo, la abogacía; la profesión médica implica la existencia por certificación de ciento sesenta y cuatro especialidades y subespecialidades reconocidas por la *American Board of Medical Specialities*, las cuales la Junta está obligada a reconocer por virtud del Art. 2(d) de la Ley Núm. 139-2008, supra.

El Colegio apunta a que cada una de estas especialidades y subespecialidades requieren medidas de entrenamiento, capacitación y educación continua distinta. Para cumplir con esto, el Colegio cuenta con Capítulos Representativos de cada especialidad, lo cual le permite tener las herramientas para proveer información sobre asuntos concernientes al interés educativo y profesional de cada especialidad. **Por otro lado, la composición de la Junta está limitada a siete médicos, lo cual le impide que tenga entre sus miembros representantes de todas las especialidades.** Indudablemente, este hecho incide en la capacidad de la Junta de mantener un sistema de educación continua adecuado para todos los miembros de la profesión.

Tras llevar a cabo el análisis de rigor, **resulta forzoso concluir que el Colegio es la medida menos onerosa legislada que tiene el Estado a su alcance para adelantar el interés apremiante de regular la profesión de los médicos cirujanos.** Esto así, pues, a pesar de compartir funciones y deberes con

la Junta, esta última no tiene la capacidad práctica para, por sí sola y sin el apoyo de un Colegio financieramente robusto, regular la profesión. Al no existir un medida menos onerosa, viable y efectiva para regular la profesión de los médicos cirujanos, soy del criterio que el requisito de colegiación compulsoria al Colegio cumple con el crisol constitucional.

Restaría, entonces, llevar a cabo el mismo análisis de escrutinio estricto con relación al segundo interés apremiante que resalta el Estado para justificar la colegiación compulsoria en este caso: salvaguardar la salud pública. Nótese que el Tribunal Supremo de los Estados Unidos ha señalado la salud pública como un interés tan apremiante y fundamental, que puede incidir sobre derechos individuales. Véase: Jacobson v. Masachussetts, 195 US 11 (1905).

**En consideración de la importancia de la obligación del Estado para salvaguardar la salud pública, es inexorable colegir que, en el caso de los Médicos Cirujanos, la colegiación compulsoria es la medida menos onerosa para adelantar este interés apremiante.** Esto así, por dos razones: 1) el Colegio no es una imagen virtual de la Junta, sino que tiene un número de obligaciones impuestas por ley de carácter estrictamente públicas que no comparte con la Junta, y 2) el argumento relacionado con la viabilidad de la medida menos onerosa en este caso no es uno basado en especulaciones, sino en la historia del Colegio en las pasadas tres décadas.

Sobre el primer punto, tras un estudio cuidadoso de sus

respectivas leyes, resulta evidente que ambas organizaciones, el Colegio y la Junta, no son meros reflejos el uno del otro. Por el contrario, la Asamblea Legislativa limitó las responsabilidades de la Junta a aquellas estrictamente relacionadas con la regulación de la profesión, mientras que le otorgó al Colegio una serie de obligaciones dirigidas a salvaguardar el bienestar y la salud pública que no están intrínsecamente relacionadas con la regulación de la profesión. Como reseñamos previamente, estas obligaciones de índole pública son las siguientes:

(a) Ayudar al mejoramiento de la salud del pueblo de Puerto Rico.

(b) Fomentar el mejoramiento del ejercicio de la medicina.

(c) Promover y divulgar el continuo progreso de la medicina.

(d) Cooperar con los gobiernos municipales, estatal y federal, y sus agencias, instrumentalidades públicas y organismos reguladores, en el diseño y la implantación de la política pública sobre la salud en Puerto Rico, cuando sean requerido para ello.

(e) Colaborar para que la prestación de los servicios médico-hospitalarios en Puerto Rico sean de la misma calidad para todo individuo, independientemente de su condición económica, raza, color, origen, religión, sexo o credo político.
.   .   .   .   .   .   .   .

(f) Defender la confidencialidad de la relación entre médico y paciente, de conformidad con los parámetros dispuestos en la legislación aplicable;
.   .   .   .   .   .   .   .

(g) Orientar a la comunidad sobre problemas de la salud pública y de asistencia médica;

(h)   Instar a que el médico sea de la mayor utilidad posible para nuestro pueblo en la prevención de las enfermedades, así como parte del mejoramiento de la calidad de vida;

(i)   Cooperar con los organismos gubernamentales y las entidades privadas correspondientes y orientar a la comunidad para alcanzar el mayor grado de razonabilidad posible en los costos de los servicios de salud. 20 LPRA sec. 73d.

El Colegio ha cumplido de manera concreta con estas obligaciones, que no comparte con la Junta, a través de un sinnúmero de gestiones. Un ejemplo de esto es la creación de la Fundación del Colegio de Médicos Cirujanos de Puerto Rico, corporación sin fines de lucro. Las funciones principales de la Fundación incluyen, entre otras: (1) proveer programas de servicios a la comunidad, educativos, deportivos, artísticos, culturales y cualesquiera otros de interés social y profesional; (2) promover la enseñanza de las ciencias médicas en Puerto Rico, en armonía con la reglamentación aplicable adoptada por el Consejo de Educación Superior o por cualquier otro organismo acreditador con autoridad al respecto; (3) promover la prestación de servicios de salud dirigidos a sectores médicamente indigentes y que dependen de programas de bienestar social; y, (4) realizar actividades que generen fondos. *Reglamento General Del Colegio De Médicos Cirujanos De Puerto Rico*, aprobado el 26 de abril de 2015.

Las ayudas comunitarias ofrecidas por la Fundación desde el 2016 comprenden: (1) Evaluaciones pediátricas a niños con impedimentos del programa de las Olimpiadas Especiales; (2) Participación destacada a los niños y a la educación médica

en la actividad Colegio Médico con el Pueblo en el Parque Julia de Burgos en Carolina; (3) Visitas a comunidades especiales; (4) Donativos de equipo médico (sillas de ruedas motorizadas, concentradores de oxígeno); (5) Asistencia médica en el Foro de Liderazgo para Jóvenes Universitarios con Impedimentos organizado por la Oficina del Procurador para Personas con Impedimentos (OPPI) y la Oficina de Educación y Relaciones con la Comunidad; (6) Orientaciones sobre el dengue, ZIKA, H1N1, COVID-19; (7) Clínicas de vacunación; (8) Orientaciones sobre efectos de fumigación con NALED, alimentos GMO, glifosatos, depósitos de cenizas y otros carcinógenos; (9) Brigadas de equipos multidisciplinarios de "first responders" que visitaron comunidades aisladas en varios municipios después del Huracán María, y (10) Auspicios de ferias de salud (Feria Multifásica de Salud Misión Médica Internacional Dr. Mario Porrata, Cardiday).[3]

Además, los estudios de investigación o auspicios de la Fundación en pro de la medicina y la salud pública incluyen: (1) La planificación de un proyecto piloto sobre el uso de la buprenorfina en pacientes jóvenes adultos adictos, con la ayuda de agencias gubernamentales y otros;(2) Co-auspiciar, con la Fundación Operación Solidaridad, un estudio para conocer el "Perfil de Violencia en Puerto Rico: Factores de Riesgo, Retos y Propuestas"; (3) Estudio investigativo conjuntamente con el Comité de Salud Ambiental sobre el análisis de metales en el particulado que proviene de las

---

[3] Apéndice, pág. 147.

canteras en la comunidad Canarico en Juana Díaz; (4) Auspicios de dos estudiantes de la Escuela de Salud Pública para concluir un estudio ambiental; (5) Auspicio al Taller Musical Triole Tá, quienes trabajan con el desarrollo sicomotor de niños hiperactivos, autistas, con déficit de atención o distrofia muscular, a través de la música; (6) Auspicio al Club de Robótica de la Escuela Especializada en Ciencias y Matemáticas Sotero Figueroa; (7) Auspicio al Campamento de Verano Sonrisas: Lucha contra el SIDA; (8) Presentación de resultados del estudio Prevalencia de enfermedades crónicas en las comunidades de Miramar y Puerto Jobos del municipio de Guayama, y (9) Auspicio 5K a beneficio del Hospital de Niño.[4]

Por otro lado, el Colegio creó el Instituto De Investigación Clínica y Desarrollo Tecnológico, que tiene a su cargo programas y actividades para todos los colegiados en adiestramiento, en instituciones académicas y en la práctica privada dirigidos primordialmente a educar, promover, fomentar, facilitar e impulsar estudios científicos tanto en el área clínica como en el área de tecnología que contribuyan al adelanto de la salud pública de nuestro pueblo. Para garantizar los fondos para el funcionamiento del Instituto, se le asigna un presupuesto anual correspondiente al uno por ciento (1%) del dinero recaudado en concepto de cuotas.[5]

Sobre esto, se pueden resaltar varias iniciativas del Colegio que tuvieron el propósito de colaborar con el Estado en salvaguardar la salud pública en tiempos de emergencia.

---

[4] Apéndice, pág. 148.
[5] Apéndice, pág. 144-145.

Por ejemplo, durante el estado de emergencia subsiguiente al Huracán María, el Coolegio tuvo a su cargo la administración y control de un banco de medicamentos para uso y distribución durante las clínicas en que los médicos voluntarios participaron a través de la Isla durante varios meses que duró la emergencia.[6] El Colegio también desplegó un equipo de profesionales voluntarios de distintas especialidades para la distribución de medicamentos y cuidado de la salud de los afectados por los temblores del área sur y fue designado por Departamento de Salud de Puerto Rico para ser el custodio y administrador del banco de medicamentos.[7] Finalmente, el Colegio organizó y mantuvo una clínica de pruebas gratuitas de COVID-19, apoyado por voluntarios del Colegio de Enfermeros Profesionales de Puerto Rico y con el suplido de pruebas por parte del Departamento de Salud; el Colegio realizó más de ocho mil (8,000) pruebas rápidas y moleculares, convirtiéndose en un recurso esencial para las estadísticas reportadas en el Departamento de Salud de Puerto Rico.[8]

Como se puede observar, es indudable que al Colegio se le han impuesto responsabilidades por ley que no comparte con la Junta dirigidas a salvaguardar la salud pública. **Es forzoso concluir que la Junta no puede ser el medio menos oneroso disponible al Estado para hacer valer este interés apremiante.** Sin embargo, esto no es suficiente para finalizar este análisis, pues resta evaluar si el medio menos oneroso en este

---

[6] Apéndice, pág. 148.
[7] Íd.
[8] Íd.

caso es que el Colegio siga cumpliendo con sus deberes sin exigir la colegiación compulsoria.

La controversia presente no requería recurrir a un ejercicio especulativo para auscultar la viabilidad y efectividad del Colegio y de la Junta sin el requisito de la colegiación compulsoria. Esto así, ya que, tal y como reseñé anteriormente, el Colegio ha pasado por varios cambios a través de los años, incluyendo un periodo en el cual la Asamblea Legislativa eliminó el requisito de colegiación compulsoria.

Es decir, no teníamos que intentar de imaginar cómo se verían afectados los esfuerzos del Colegio para hacer valer su razón de ser, **sino que ya la historia nos indica exactamente lo que ocurrió tras la descolegiación de la profesión en el año 1997.** A la Asamblea Legislativa le tomó tan solo cuatro años percatarse del efecto nocivo que había tenido la colegiación voluntaria sobre la capacidad del Colegio para cumplir con sus deberes y responsabilidades de índole pública. Es por esto por lo que la Asamblea Legislativa expresó de manera contundente en la Exposición de Motivos de la Ley Núm. 56-2001, supra, que la reinstauración del requisito de colegiación compulsoria estuvo motivada por la necesidad de tener un **"Colegio de Médicos-Cirujanos fuerte y vigoroso"** que pueda ayudar al Estado y la sociedad a enfrentar los problemas en el área de salud pública. Exposición de Motivos de la Ley Núm. 56 de 13 de julio de 2001 (2001 [Parte 1] Leyes de Puerto Rico 269, 271). Es decir, la Asamblea Legislativa reconoció

la realidad de que la colegiación voluntaria al Colegio no resultó ser viable para hacer valer su interés apremiante. Entonces, si en el año 1997 la colegiación voluntaria tuvo la consecuencia de debilitar al Colegio a tal punto que no podía cumplir con sus deberes, **resulta lógico concluir que en el año 2023 la colegiación voluntaria continúa siendo un método inefectivo y no viable para salvaguardar la salud pública.**

**No puede ser que, teniendo el beneficio de conocer de primera mano los efectos nefastos que tuvo la colegiación voluntaria sobre el Colegio hace dos décadas, este Tribunal concluya, sin razón alguna, que la eliminación de la colegiación compulsoria hoy tendrá un efecto distinto.**

## IV

En síntesis, he evaluado la constitucionalidad del requisito de colegiación compulsoria al Colegio a la luz del escrutinio estricto, tomando en consideración los dos intereses apremiantes del Estado.

En primer lugar, a pesar de compartir deberes y facultades relacionadas con la regulación de la profesión con la Junta, la realidad es que la referida junta no tiene la capacidad de regular la profesión por sí sola de manera efectiva y viable. Aunque en teoría está facultada en ley para regular la profesión, no constituye la medida menos onerosa, efectiva y viable, y necesita del Colegio y de la colegiación compulsoria para cumplir con sus deberes.

En segundo lugar, el Colegio tiene múltiples deberes y facultades dirigidos a cumplir con el interés apremiante de

salvaguardar la salud pública que no comparte con la Junta. Además, recalqué que ya se ha hecho un intento de permitir la colegiación voluntaria en la profesión de los médicos cirujanos, pero esto tuvo un efecto perjudicial en la capacidad del Colegio para cumplir con sus responsabilidades.

A la luz de lo expuesto, era preciso concluir que la colegiación voluntaria tampoco constituye el medio menos oneroso para adelantar el interés apremiante del Estado. Al disponer lo contrario, una mayoría de este Tribunal ignora la historia del Colegio y las expresiones que ha hecho la Asamblea Legislativa al respecto.

**Nuevamente, se aborda este tipo controversia sin considerar sus particularidades y en total abstracción de las consecuencias de este dictamen, máxime para una profesión que tiene un rol hegemónico en salvaguardar la salud. Con este proceder nefasto, según mencioné, se perjudica a la ciudadanía. Me veo imposibilita de embarcarme por ese rumbo.**

V

Por los fundamentos esbozados, disiento.


                                    Maite D. Oronoz Rodríguez
                                    Jueza Presidenta

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

Héctor Luis Delucca Jiménez

    Apelado

        v.                AC-2022-0083

Colegio de Médicos Cirujanos
de Puerto Rico y otros

    Apelantes

Opinión Disidente emitida por el Juez Asociado señor COLÓN PÉREZ.

En San Juan, Puerto Rico, a 2 de octubre de 2023.

Insistimos, el requisito de colegiación compulsoria que se exige en nuestro País, como condición para ejercer determinadas profesiones, es una medida de protección social. El mismo, a todas luces, puede co-habitar en nuestro ordenamiento jurídico con el derecho constitucional a la libre asociación. Tal y como hemos expresado en el pasado, uno no cancela al otro.

Por tal razón, hoy reafirmamos nuestros pronunciamientos en *Reyes Sorto et al. v. CIAPR*, 2023 TSPR 62, 212 DPR __ (2023), Opinión de conformidad del Juez Asociado Colón Pérez,

en cuanto a la constitucionalidad del requisito de colegiación compulsoria para poder ejercer determinadas profesiones en nuestra jurisdicción; en esta ocasión, aquella que se requiere para desempeñarse como médico-cirujano en Puerto Rico. Por no ser ésta la postura de una mayoría de este Tribunal, disentimos.

I.

Los hechos medulares que dan margen al presente litigio no están en controversia. Allá para el 14 de enero de 2020, el Dr. Héctor Luis Delucca Jiménez (en adelante, "doctor Delucca Jiménez"), médico de profesión, presentó ante el Tribunal de Primera Instancia una *Demanda* sobre sentencia declaratoria en contra del Colegio de Médicos-Cirujanos de Puerto Rico (en adelante, "Colegio de Médicos Cirujanos") y del Estado Libre Asociado de Puerto Rico (en adelante, "ELA"). En ésta, a grandes rasgos, arguyó que la Ley Núm. 77-1994, *infra*, la cual creó el referido colegio y exige la colegiación compulsoria de los médicos-cirujanos como condición para poder ejercer dicha profesión en nuestra jurisdicción, era inconstitucional.

En específico, y mediante *Moción en solicitud de sentencia sumaria*, el doctor Delucca Jiménez argumentó que la obligación de pertenecer al Colegio de Médicos Cirujanos, impuesta por el estatuto de referencia, violentaba su derecho a la libre asociación y que no existía un interés público que lo justificara. En virtud de ello, solicitó que se decretara la inconstitucionalidad del requisito de

colegiación compulsoria dispuesto en la Ley Núm. 77-1994, *infra*.

En respuesta, el ELA, mediante su *Moción de sentencia sumaria* argumentó que, dado el interés apremiante del Estado en promover y velar por la seguridad, salud, bienestar general y vida de la población, en el caso del requisito de colegiación compulsoria para poder ejercer la profesión de médico-cirujano en nuestro País, el derecho de asociación del doctor Delucca Jiménez debía ceder. Por su parte, el Colegio de Médicos Cirujanos, mediante su *Respuesta del CMCPR*, se unió a lo expresado por el ELA.

Así las cosas, evaluados los argumentos de todas las partes en el litigio, y tras varios incidentes procesales no necesarios pormenorizar aquí, el 18 de septiembre de 2020 el Tribunal de Primera Instancia dictó *Sentencia*. Al así hacerlo, -- y por considerar que el requisito de colegiación compulsoria para poder ejercer en nuestra jurisdicción la profesión de médico cirujano era la alternativa menos onerosa en el ejercicio de regular a estos y estas profesionales --, emitió un sentencia sumaria a favor del Colegio de Médicos Cirujanos y del ELA, validando así la constitucionalidad del referido requisito.

Inconforme con el proceder del foro primario, el doctor Delucca Jiménez acudió al Tribunal de Apelaciones mediante una *Apelación de sentencia*. En síntesis, argumentó que el Tribunal de Primera Instancia había errado en su decisión,

pues la misma coarta el derecho a la libertad de asociación de los médicos-cirujanos que aquí ejercen esa profesión.

Enterados de lo anterior, tanto el Colegio de Médicos Cirujanos, como el ELA, comparecieron ante el foro apelativo intermedio, en oposición a lo solicitado por el doctor Delucca Jiménez. En sus respectivos alegatos, esbozaron argumentos similares a los expresados ante el foro primario.

Así las cosas, examinados los alegatos de las partes, el Tribunal de Apelaciones notificó una *Sentencia* mediante la cual revocó el dictamen emitido por el Tribunal de Primera Instancia. Esto, por entender que el Estado, al requerir la colegiación compulsoria como requisito para ejercer la profesión de médico-cirujano en el País, interfirió con el derecho fundamental a la libertad de asociación que le asiste al doctor Delucca Jiménez y que la mencionada interferencia no superaba el escrutinio estricto. Lo anterior, haciendo caso omiso al interés apremiante del Estado en promover y velar por la seguridad, salud, bienestar general y vida de los y las ciudadanas del País, y sin tener prueba que acreditara que los supuestos medios menos onerosos eran, al menos, viables.

En desacuerdo con la mencionada sentencia, el Colegio de Médicos Cirujanos solicitó su reconsideración. Sin embargo, dicha solicitud fue denegada por el foro apelativo intermedio.

Insatisfecho con la determinación tomada por el Tribunal de Apelaciones, el referido colegio acudió ante nos

mediante recurso de *Apelación*. En esencia, nos señala que el foro apelativo intermedio erró al revocar el dictamen sumario emitido por el foro primario y, de esta forma, declarar la inconstitucionalidad del requisito de colegiación compulsoria para poder ejercer la profesión médica en nuestra jurisdicción. A su modo de ver, el Tribunal de Apelaciones carecía de los elementos probatorios necesarios para revocar la determinación del Tribunal de Primera Instancia y sentenciar que la colegiación compulsoria de los profesionales que forman parte de este gremio era inconstitucional.

Trabada así la controversia, y con el beneficio de la comparecencia de todas las partes con interés en el litigio, este Tribunal -- a nuestro juicio, erradamente -- confirma la *Sentencia* emitida por el foro apelativo intermedio y declara inconstitucional el requisito de colegiación compulsoria para poder ejercer la profesión de médico-cirujano en nuestro País, según se establece en los Artículos 7 y 8 de la Ley 77-1994, *infra*. Por no estar de acuerdo con dicho proceder, disentimos. Explicamos el porqué.

II.

A.

Como es sabido, el Artículo II, Sección 4, de la Constitución del Estado Libre Asociado de Puerto Rico consagra el derecho fundamental del Pueblo a la libertad de expresión y a reunirse de forma pacífica. Art. II, Sec. 4,

Const. ELA, LPRA, Tomo 1, ed. 2016, pág. 290. Por su parte, el Artículo II, Sección 6, incorpora el derecho a que "[l]as personas p[uedan] asociarse y organizarse libremente para cualquier fin lícito, salvo en organizaciones militares o cuasi militares". *Íd.*, pág. 299. Ambos derechos -- el de expresión y el de asociación -- son fundamentales para la consecución y el ejercicio de la libertad de conciencia, necesaria en toda democracia. *U.P.R. v. Laborde Torres y otros I*, 180 DPR 253, 286 (2010); *P.R.T.C. v. Unión Indep. Emp. Telefónicos*, 131 DPR 171, 186 (1992). Véase, *Reyes Sorto et al. v. CIAPR*, *supra*, Opinión de conformidad del Juez Asociado Colón Pérez.

**Ahora bien, no empece a que en nuestra Carta Magna están expresamente consagrados los derechos a la libertad de expresión y a la libre asociación, -- del cual se deriva su vertiente negativa, es decir, el derecho a no asociarse --, en múltiples ocasiones hemos sentenciado que tales derechos no son absolutos**. (Negrilla suplida). *P.N.P. v. De Castro Font II*, 172 DPR 883, 893-894 (2007); *P.A.C. v. E.L.A. I*, 150 DPR 359, 372 (2000); *Democratic Party v. Tribunal Electoral*, 107 DPR 1, 25 (1978). **Por tanto, en aquellos escenarios en los cuales se alegue una violación a alguno de estos derechos, "[l]os tribunales debe[rán] ..., sopesar el alcance de la restricción a la libre expresión y asociación y la importancia del interés gubernamental que anima la restricción, a la luz de la amenaza que la conducta impedida representa para tal interés del Estado"**. (Negrilla

suplida). *Rodríguez v. Srio. de Instrucción*, 109 DPR 251, 255-256 (1979). **Lo anterior, pues, "los derechos individuales tienen que entenderse dentro del cuadro general de la sociedad con arreglo a las limitaciones inherentes a la vida en común"**. (Negrilla suplida). 4 Diario de Sesiones de la Convención Constituyente de Puerto Rico, 2576 (1961). Véase, *S.I.U. de P.R. v. Otis Elevator Co.*, 105 DPR 832, 842-843 (1977). Véase, además, *Reyes Sorto et al. v. CIAPR*, *supra*, Opinión de conformidad del Juez Asociado Colón Pérez.

### B.

Establecido lo anterior, debemos reiterar que "toda comunidad políticamente organizada tiene lo que hemos llamado el poder público del estado o '*police power*' para salvaguardar la seguridad, la salud y el bienestar de sus habitantes". (Citas omitidas y cita depurada). *Domínguez Castro v. E.L.A.*, 178 DPR 1, 36 (2010). En el ejercicio de ese poder, la Asamblea Legislativa tiene la facultad de regular y controlar la práctica de las profesiones, -- salvo la jurídica --, a fin de proteger la salud y el bienestar público, así como evitar el fraude y la incompetencia. *Rodríguez Casillas et al. v. Colegio*, 202 DPR 428, 439-440 (2019); *Accurate Sols. v. Heritage Environmental*, 193 DPR 423, 434 (2015). Véase, *Reyes Sorto et al. v. CIAPR*, *supra*, Opinión de conformidad del Juez Asociado Colón Pérez.

Al respecto, este Tribunal ha establecido que dichas regulaciones no privan a los ciudadanos y a las ciudadanas de sus profesiones. *San Miguel Lorenzana v. E.L.A.*, 134 DPR

405, 413 (1993); *Asoc. Drs. Med. Cui. Salud v. Morales*, 132 DPR 567, 586 (1993). Véase, *Reyes Sorto et al. v. CIAPR*, *supra*, Opinión de conformidad del Juez Asociado Colón Pérez. En particular, hemos sentenciado que las profesiones y oficios se regulan por razones del eminente interés público del que están revestidas. *Íd.*

Con la intención de proteger el mencionado interés público, mediante estatutos, se han formado diversos colegios profesionales para que éstos "defiend[a]n los intereses de los gremios que agrupan [y, además], los de la ciudadanía en general". *Rodriguez Casillas v. Colegio*, *supra*, pág. 473, Opinión disidente del Juez Asociado Colón Pérez. De esta forma, según expresamos en *Rodríguez Casillas et al. v. Colegio*, *supra*, pág. 474, Opinión disidente del Juez Asociado Colón Pérez,

> los referidos colegios profesionales cumplen con la importante función de educar, tanto a la sociedad como a sus miembros, sobre los asuntos que atañen a su profesión. De igual forma, se aseguran de que quienes forman parte de su gremio mantengan sus conocimientos actualizados y cumplan con los requerimientos éticos que les rigen, protegiendo así a la ciudadanía de ser víctimas de prácticas ilegales o un desempeño incompetente por parte de los profesionales a los que estas instituciones regulan.

> En esa dirección, [mencionábamos] que "[e]l establecimiento de [colegios profesionales] no tiene por objeto principal la satisfacción de los intereses profesionales, ni aún los colectivos de la profesión, sino la del interés público que pueda suponer el ejercicio de determinada profesión". J. Gálvez Montes, *La organización de las profesiones tituladas*, Madrid, Consejo de Estado y Boletín Nacional de Estado, 2002, pág. 50. Esto responde a que, aunque la exigencia de una titulación funciona como garantía de que solo ejerzan una profesión aquellos que hayan acreditado tener los

conocimientos necesarios, existen ciertas profesiones en las cuales -- por sus características particulares -- no basta dicha garantía para proteger el interés público. *Íd.* Véase, además, *Reyes Sorto et al. v. CIAPR, supra,* Opinión de conformidad del Juez Asociado Colón Pérez.

C.

En ese contexto, entiéndase, en la búsqueda de proteger adecuadamente el interés público, se creó la Ley del Colegio de Médicos-Cirujanos de Puerto Rico, Ley Núm. 77 de 13 de agosto de 1994, según enmendada, (20 LPRA sec. 73 *et seq.*). Dicha disposición legal regula lo relacionado a la colegiación compulsoria de los médicos-cirujanos en nuestro País.

En lo pertinente a la controversia que nos ocupa, el Artículo 8 del mencionado cuerpo de ley establece que "[l]a colegiación será compulsoria y será requisito para poder ejercer la medicina en Puerto Rico". 20 LPRA sec. 73g. Por su parte, el Artículo 7 de la referida legislación dispone que:

> Serán miembros del Colegio todas las personas que posean una licencia regular expedida por el Tribunal Examinador autorizándoles a ejercer la medicina en Puerto Rico, conforme a lo establecido en el Artículo 13 de la Ley Núm. 22 de 22 de abril de 1931, según enmendada[1], que regula el ejercicio de la medicina en Puerto Rico y que hayan pagado la cuota anual que disponga el Reglamento del Colegio. La referida licencia deberá estar vigente y el médico cirujano deberá haber cumplido con los requisitos de recertificación que le sean aplicables.

---

[1] Dicha ley fue derogada y sustituida por la Ley 139-2008, 20 LPRA sec. 131 *et seq.*

**A menos que sea miembro del Colegio de Médicos Cirujanos y esté al día en el pago de las cuotas correspondientes, ninguna persona podrá ejercer la profesión de medicina en Puerto Rico, incluyendo cualesquiera especialidades de ésta, salvo por lo dispuesto en el Artículo 15 de la Ley Núm. 22 de 22 de abril de 1931, según enmendada[2], y en la Ley 79 de 28 de junio de 1978, según enmendada[3]. 20 LPRA sec. 73f.** (Negrilla suplida).

Sobre el alcance de sus deberes, debemos señalar que el Colegio Médicos Cirujanos tiene la obligación de:

A. Ayudar al mejoramiento de la salud del pueblo de Puerto Rico.

B. Fomentar el mejoramiento del ejercicio de la medicina.

C. Promover y divulgar el continuo progreso de la medicina.

D. Cooperar con los gobiernos municipales, estatal y federal, y sus agencias, instrumentalidades públicas y organismos reguladores, en el diseño y la implantación de la política pública sobre la salud en Puerto Rico, cuando sean requeridos para ello.

E. Colaborar para que la prestación de los servicios médico-hospitalarios en Puerto Rico sean de la misma calidad para todo individuo, independientemente de su condición económica, raza, color, origen, religión, sexo o credo político.

F. Elevar y mantener la dignidad de la profesión y de sus miembros y desalentar, velar y denunciar la práctica desleal y anti-ética en el ejercicio de la profesión.

G. Defender la confidencialidad de la relación entre médico y paciente, de conformidad con los parámetros dispuestos en la legislación aplicable.

---

[2] La mencionada ley fue derogada y sustituida por la Ley 139-2008, 20 LPRA sec. 131 *et seq*.

[3] La referida legislación fue derogada por la Ley Núm. 109-1996.

H. Defender los derechos e inmunidades de los médicos en armonía con el interés público.

I. Orientar a la comunidad sobre problemas de la salud pública y de asistencia médica.

J. Instar a que el médico sea de la mayor utilidad posible para nuestro pueblo en la prevención de las enfermedades, así como parte del mejoramiento de la calidad de vida.

K. Cooperar con los organismos gubernamentales y las entidades privadas correspondientes y orientar a la comunidad para alcanzar el mayor grado de razonabilidad posible en los costos de los servicios de salud.

L. Establecer, de acuerdo a la capacidad económica del Colegio, medidas de protección mutua para los colegiados.

M. Estrechar los lazos de amistad y compañerismo entre los colegiados.

N. Promover el mejoramiento profesional de todos los colegiados mediante la viabilización de la educación médica continua conforme a los criterios establecidos por el Tribunal Examinador y a lo dispuesto en el Artículo 4(L) de esta Ley, y por otros medios.

O. Tomar las medidas apropiadas, necesarias y convenientes en derecho para hacer efectivos los deberes aquí señalados. 20 LPRA sec. 73d.

Como se puede apreciar, son muchas las funciones que el Colegio de Médicos Cirujanos realiza, particularmente en las áreas de protección social, salud, ética y educación continua. Las mismas son de suma importancia para la regulación y sostenimiento de la profesión médica en nuestro País.

Es, pues, a la luz de la normativa antes expuesta, y no de otra, que procedía disponer de la causa de epígrafe. Como una mayoría de este tribunal no lo hizo, procedemos -- desde la disidencia, nuevamente -- a así hacerlo.

III.

Como mencionamos anteriormente, en el presente caso, el Colegio de Médicos Cirujanos, en esencia, sostiene que el Tribunal de Apelaciones erró al revocar al Tribunal de Primera Instancia y declarar la inconstitucionalidad del requisito de colegiación compulsoria como condición para ejercer la profesión médica en nuestra jurisdicción. Le asiste la razón.

Y es que, el Juez que suscribe no alberga duda alguna que el requisito de colegiación compulsoria para practicar determinada profesión en el País puede cohabitar armoniosamente en nuestro ordenamiento jurídico con el derecho a la libre asociación. Uno no cancela al otro.

En ese sentido, -- al igual que muchos tratadistas del tema --, vemos el requisito de colegiación compulsoria para ejercer determinada profesión como una medida de protección social; lo que, a todas luces, constituye el interés apremiante al que se refiere la doctrina constitucional antes expuesta. De igual manera, en lo que respecta a este caso, se trata también de la alternativa menos onerosa para adelantar el referido interés. Esto, debido a que es el Colegio de Médicos Cirujanos, y no la Junta de Licenciamiento y Disciplina Médica, -- quienes solo se limitan a la regulación la licencia y de la disciplina de estos profesionales --, a quien la Asamblea Legislativa le ha delegado la función de salvaguardar el interés apremiante del estado de proteger la salud pública del País.

Es, pues, el Colegio de Médicos Cirujanos de Puerto Rico el ente que, -- en nuestra jurisdicción --, verdaderamente ejerce las funciones necesarias para asegurar los estándares adecuados para las profesiones en cuestión, convirtiéndose así en la alternativa menos onerosa a la que llama el ordenamiento constitucional al momento de disponer de casos como éste. De lo anterior, no albergamos duda alguna.

Ciertamente se cometió el error aquí señalado. El requisito de colegiación compulsoria exigido a los médicos-cirujanos para poder practicar su profesión en nuestra jurisdicción es, a nuestro parecer, uno constitucionalmente válido.

IV.

Por los fundamentos antes expuestos, disentimos del proceder de una mayoría de este Tribunal en el día de hoy.


Ángel Colón Pérez
Juez Asociado